363 S.E.2d 449

**Gary Lynn CROSS**

v.

**Trinichia Lee CROSS.**

No. 17578.

Supreme Court of Appeals of
West Virginia.

Nov. 17, 1987.

Rehearing Denied Feb. 3, 1988.

Larry L. Skeen, Ripley, for appellant.

Charles R. Garten, Charleston, for appellee.

NEELY, Justice:

Gary Lynn Cross and Trinichia Lee Cross were married in 1969. They had four children. During the marriage, Gary Cross was employed by the Jackson County Board of Education as a teacher and re-

cently was promoted to principal. Trinichia Cross has never worked although she has a college liberal arts degree; she was a homemaker during the marriage.

On 7 June 1984, the appellee, Gary Cross, filed for divorce in Jackson County. His complaint prayed for liberal visitation with the children and equitable distribution of the marital property. By counterclaim, the appellant, Trinichia Lee Cross, sought, *inter alia*, custody of the children, alimony and an equitable division of marital property. Mrs. Cross alleged a history of poor health and asserted a claim for permanent alimony based upon her medical needs. The parties' marital property consisted of their marital house in Ravenswood, one car and Gary Cross' employment-related retirement account. According to Mrs. Cross, part of the marital property was the fair market value of the appellee's retirement account that was earned in the county school system during their marriage. Evidence on behalf of the parties was taken before a special commissioner.

By final order the circuit court granted the parties a divorce and determined the following:

(a) custody of the children was given to Trinichia Cross, with Gary Cross to pay $125 per month per child toward child support;

(b) Gary Cross was entitled to claim the children as an exemption for income tax purposes;

(c) Trinichia Cross was awarded exclusive use and possession of the former marital home as an incident to support and maintenance of the children until the youngest reaches age 18; and,

(d) Trinichia Cross was awarded rehabilitative alimony of $125 per month for no longer than five years.

## I

We first addressed rehabilitative alimony in Syl. pt. 1 of *Molnar v. Molnar*, 173 W.Va. 200, 314 S.E.2d 73 (1984): "The concept of 'rehabilitative alimony' generally connotes an attempt to encourage a dependent spouse to become self-supporting by providing alimony for a limited period of time during which gainful employment can be obtained." Rehabilitative alimony has been used frequently when a dependent spouse enters a marriage with marketable skills, which then deteriorated through lack of use, or the dependent spouse is capable of becoming self-supporting through training or academic study. In these circumstances, an award of alimony for a limited time is appropriate to give a dependent wife an opportunity to revitalize old skills or acquire new ones.[1]

"There are three broad inquiries that need to be considered in regard to rehabilitative alimony: (1) whether in view of the length of the marriage and the age, health, and skills of the dependent spouse, it should be granted; (2) if it is feasible, then the amount and duration of rehabilitative alimony must be determined; and (3) consideration should be given to continuing jurisdiction to reconsider the amount and duration of rehabilitative alimony." *Molnar v. Molnar, supra*, 173 W.Va. at 205, at 314 S.E.2d 78. *See also, Luff v. Luff*, 174 W.Va. 734, 329 S.E.2d 100 (1985), appeal after remand 177 W.Va. 247, 351 S.E.2d 434 (1986); Syl. Pt. 5, *Butcher v. Butcher*, 178 W.Va. 33, 357 S.E.2d 226 (1987); *W.Va. Code*, 48-2-16(b) [1984].[2] It is significant

---

1. *See generally* Gillman, "Alimony Spousal Support: From Punishment to Rehabilitation," 7 *Community Prop.J.* 135 (1980); Comment, "Rehabilitative Spousal Support: In Need of a More Comprehensive Approach to Mitigating Dissolution Trama," 12 *U.San.Fran.L.Rev.* 493 (1978); Annot. 97 ALR3d 740 (1980).

2. *W.Va.Code*, 48-2-16(b) [1984] states, in pertinent part, that the court shall consider the following factors in determining the amount of alimony and child support:

(1) The length of time the parties were married;
(2) The period of time during the marriage when the parties actually lived together as husband and wife;
(3) The present employment income and other recurring earnings of each party from any source;
(4) The income-earning abilities of each of the parties, based upon such factors as educational background, training, employment skills, work experience, length of absence

that *W.Va.Code*, 48–2–16(b) [1984] does not require the trial court to make express findings about each of these sixteen criteria, only that each be considered in determining the amount of alimony. Furthermore, in our earlier opinions, we have considered the age and health of the parties, their standard of living, and the duration of the marriage in determining the amount of alimony awards.[3]

On appeal, appellant asserts that due to her poor health, she should be awarded permanent rather than rehabilitative alimony. We disagree and find the award of rehabilitative alimony was within the sound discretion of the circuit court. First, the record does not support a conclusion that Trinichia Cross has poor health. Trinichia Cross apparently has nagging but not debilitating health problems and is able to carry out all her normal household tasks. Appellant failed to offer medical evidence to the commissioner to support her present claim of poor health.[4] Therefore, we see no reason to disallow rehabilitative alimony based on appellant's health.

Next, appellant asserts, citing *Dyer v. Tsapis*, 162 W.Va. 289, 249 S.E.2d 509, 513

(1978), that her age and homemaker status will prevent her from finding employment. Many employers, she argues, are reluctant to hire older workers for fear of increased health and pension costs, and because the cost of training older workers cannot be amortized over as many years as with younger workers. However, the court's final order did not foreclose permanent alimony in the future and appellant has not yet tried to find employment and been unsuccessful.

Even if Mrs. Cross were granted permanent alimony, she would still need to work at least part time because $625 a month alimony and child support will not suffice for a single parent family of five. With a college degree, appellant has a good chance of obtaining employment and the court's order encouraging her to do so was proper. If appellant's health fails, or she has not found a job after five years of diligent effort, the court may reconsider the amount and duration of rehabilitative alimony. In five years, Mrs. Cross's youngest child will be twelve years old and, therefore, will not impede her employment opportunities.

from the job market and custodial responsibilities for children;

(5) The distribution of marital property to be made under the terms of a separation agreement or by the court under the provisions of section thirty-two [§ 48–2–32] of this article, insofar as the distribution affects or will affect the earnings of the parties and their ability to pay or their need to receive alimony, child support or separate maintenance;

(6) The age and the physical, mental and emotional condition of each party;

(7) The educational qualifications of each party;

(8) The likelihood that the party seeking alimony, child support or separate maintenance can substantially increase his or her income-earning abilities within a reasonable time by acquiring additional education or training;

(9) The anticipated expense of obtaining the education and training described in subdivision (8) above;

(10) The costs of educating minor children;

(11) The costs of providing health care for each of the parties and their minor children;

(12) The tax consequences to each party;

(13) The extent to which it would be inappropriate for a party, because said party will be the custodian of a minor child or children, to seek employment outside the home;

(14) The financial need of each party;

(15) The legal obligations of each party to support himself or herself and to support any other person; and

(16) Such other factors as the court deems necessary or appropriate to consider in order to arrive at a fair and equitable grant of alimony, child support or separate maintenance.

3. *See, Yanero v. Yanero,* 171 W.Va. 88, 297 S.E.2d 863 (1982); *Purnell v. Purnell,* 167 W.Va. 715, 280 S.E.2d 281 (1981); *Haynes v. Haynes,* 164 W.Va. 426, 264 S.E.2d 474 (1980); *Zinn v. Zinn,* 164 W.Va. 142, 260 S.E.2d 844 (1979); *Dyer v. Tsapis,* 162 W.Va. 289, 249 S.E.2d 509 (1978).

4. When on the witness stand, appellant testified to having thyroiditis for which she took Synthroid, and scoliosis and lardosis (neither of which is debilitating or requires medication), and finally a dry eye condition for which she took eye drops. She described other afflictions such as allergies, sinus infections and fibrocystic breast disease. But despite all these maladies, she testified that she had seen a doctor only once in the past year.

## II

■ The next issue raised is whether the new 1986 West Virginia legislation governing equitable distribution of marital property is to be retroactively applied to a divorce decree that preceded its enactment.[5] The divorce decree in this proceeding was entered in November, 1985 and the new legislation that specifically includes "a pension or retirement program" as earnings or marital property did not become effective until 1986.[6] We find, however, that the 1986 Amendment simply clarified the law as it existed under earlier *Code* provisions and our case of *LaRue v. LaRue*, 172 W.Va. 158, 304 S.E.2d 312 (1983).

*W.Va.Code*, 48-2-1 [1984] and *W.Va. Code*, 48-2-32 [1984], in effect at the time of divorce, did not specifically mention pension plans; nonetheless, these two *Code* sections were broad enough in their general provisions to encompass pension plans. *See, Larue v. Larue, supra.* Therefore, the circuit court erred in not considering appellee's state teachers' pension account when equitably distributing the marital assets between the parties.

## III

■ Appellant assigns as error the circuit court's failure to award her one-half of the present value or proportional future benefits of Gary Cross' teachers' pension. Since this Court's decision in *LaRue, supra*, the equitable concept that each marital partner should receive the benefit of his or her contributions toward the accumulated assets of the marriage has been the focus of a court in distributing marital property. Property acquired or economic gain realized as the result of joint efforts

are accorded their true character, irrespective of the nominal owner of the right or interest. *Butcher v. Butcher*, 178 W.Va. 33, 357 S.E.2d 226 (1987).

■ "The doctrine of equitable distribution permits a spouse, who has made a material economic contribution toward the acquisition of property which is titled in the name of or under the control of the other spouse, to claim an equitable interest in such property in a proceeding seeking a divorce." Syllabus Point 2, *LaRue, supra*, 172 W.Va. at 160, 304 S.E.2d at 313–314. Indeed, following the guidelines set out in *Larue*, the West Virginia Legislature has amended the domestic relations statutes to codify the equitable principles set out in *LaRue. Acts of the Legislature*, regular session, 1986, Chap. 42; *See also, Fischer v. Fischer*, 175 W.Va. 753, 338 S.E.2d 233 (1985). The post-*LaRue* legislation, for example, clearly delineates the marital property (as opposed to the also defined "separate property") that is subject to equitable distribution upon divorce.[7]

■ Unquestionably, Mr. Cross's retirement account (or the right to receive future benefits from that account) is marital property. Even if Mr. Cross's pension rights are not subject to division, they are properly includable in the total marital assets and can be used to offset other property. Virtually all but five months' worth of the accumulated pension entitlement was earned during the parties' marriage. (The appellee began his board of education employment in November, 1968 and the parties were married in April, 1969.) Whether pension rights have vested may be a relevant factor in deciding whether to include a

---

5. *See, Acts of the Legislature*, regular session, 1986 Chap. 42.

6. *See, W.Va.Code*, 48-2-1(c) [1986].

7. Under *W.Va.Code*, 48-2-1(e) [1986], marital property includes in pertinent part:
   (1) All *property and earnings acquired by either spouse during a marriage, including every valuable right and interest, corporeal or incorporeal, tangible or intangible, real or personal, regardless of the form of ownership, whether*

*legal or beneficial,* whether individually held, held in trust by a third party or whether held by the parties to the marriage in some form of co-ownership such as joint tenancy or tenancy in common, joint tenancy with the right of survivorship, or any other form of shared ownership recognized in other jurisdictions without this state, except that marital property shall not include separate property as defined in subsection (4) of this section. [*Emphasis added*]

pension fund as marital property;[8] however, appellee's right to receive benefits vested after five years of employment with the Jackson County Board of Education. *See, W.Va.Code,* 18–7A–25 [1984]. Thus, Mr. Cross's pension fund should be considered an asset in the equitable distribution of the marital property.

There is no fool-proof, scientific method regularly used by courts to divide retirement or pension benefits that have vested but not yet matured. *See,* annotation 94 A.L.R.3d 176, 233–244. Even when rights have vested because cash contributions have been paid into an actuarily sound plan, as in the present case, it may nonetheless be impossible to withdraw the money to make an equitable distribution because of the terms of the plan. This, indeed, is the case with the teachers' retirement plan of which Mr. Cross is a member because contributions are mandatory during employment and contributions cannot be withdrawn until a person stops working. *W.Va.Code,* 18–7A–13 [1980].

More frequently than not, in fact, pension contributions are mandatory for the period during which a person is employed in a particular firm or government agency and can be withdrawn only on termination of employment or retirement. Even when money can be withdrawn, however, such withdrawal may destroy the value of the pension or have oppressive tax consequences, and often there is no other money available to compensate a spouse in lieu of the money locked away in the pension plan.[9]

We hesitate to dictate any specific technique for distributing pension benefits at divorce because each pension plan case presents a different set of problems. Nonetheless, courts elsewhere have established some broad guidelines that can assist our trial courts in crafting systems to divide pension rights. Perhaps the cynosure in all the reported cases is the desirability of disentangling parties from one another as quickly and cleanly as possible. As the New Jersey appellate division said in *Kikkert v. Kikkert,* 177 N.J.Super. 471 (1981), 427 A.2d 76, aff'd. 88 N.J. 4, 438 A.2d 317 (1981):

> "Long term and deferred sharing of financial interests are obviously too susceptible to continued strife and hostility, circumstances which our courts traditionally strive to avoid to the greatest extent possible. This goal may be best accomplished if the present value of the pension is ascertainable, by fixing the other spouse's share thereof, as adjusted for all appropriate considerations, including the length of time the pensioner must survive to enjoy its benefits, to be satisfied out of other assets, leaving all pension benefits to the employee himself."

Indeed, as the New Jersey court indicated in *Kikkert,* the best of all methods of distribution is to make an evaluation of the present value of the pension rights and then pay the non-working spouse that amount. Occasionally the parties will be fortunate enough to have other marital assets that may be used to offset the value of the pension. Prominent among such assets are the jointly owned marital house, other real estate, stocks, bonds and tangible personal property like automobiles and furniture. In many cases, however, either the value of the pension will be so large that it is impossible to offset it with other marital assets or the parties will have accumulated so few assets that even a pension of modest present value cannot be offset. In those circumstances, the court can encourage the spouse who owns the pension to borrow money to pay the non-working spouse her share of the present value. Nonetheless, borrowing money is difficult enough even when everyone is wildly enthusiastic about contracting the debt, and borrowing becomes more difficult when the

---

**8.** For cases holding that pension rights are to be considered in arriving at a financial settlement, *see, LaRue, supra,* footnote 8, 172 W.Va. at 178, 304 S.E.2d at 331; *Butcher v. Butcher, supra,* 178 W.Va. at 36–41, 357 S.E.2d at 229–234. *See also,* S.R. Brown, "An Interdisciplinary Analysis of Pension Benefits In Divorce and Post–Judgment Partition Action: Cures for the Inequities of Berry v. Berry," 37 *Baylor L.Rev.* 107 (1985).

**9.** For a discussion of these problems, *see, LaRue, supra,* (Neely, J. concurring) 172 W.Va. at 178, 304 S.E.2d at 332.

borrower is reluctant. Consequently, we doubt that a court can effectively compel a working spouse to borrow money to pay the non-working spouse under these circumstances, but the court can certainly encourage such an arrangement.

■ Whenever possible, then, the best solution to the pension problem is a lump-sum distribution. However, the second solution in descending order of preference is to order the working spouse to make monthly payments to the non-working spouse (in addition to any court ordered alimony or child support) to pay the non-working spouse the present value of her share of the pension rights at the time of divorce plus interest over some term of years.[10]

Unless pension benefits are soon to be paid to the working spouse because of approaching retirement, at which point it is perhaps most convenient simply to allocate the benefits in proportion to the non-working spouse's equitable share, the least satisfactory method of dividing a pension is to allocate part of it to the non-working spouse to be collected when and if the benefits are paid. *See, In Re: Marriage of Brown*, 15 Cal.3d 838, 126 Cal.Rptr. 633, 544 P.2d 561 (Sup.Ct.1976). Nonetheless, when other methods of distribution are impossible, that is the method of last resort. As the New Jersey court said in *Kikkert, supra*:

"On the other hand, where other assets for equitable distribution are inadequate or lacking altogether, or where no present value can be established and the parties are unable to reach agreement, resort must be had to a form of deferred distribution based upon fixed percentages. In such event, the trial judge must determine how best to accomplish equitable distribution of all distributable property including, as appropriate, the

sharing in fixed percentages of the pension payments when received."

427 A.2d at 80. *See also, Pinkowski v. Pinkowski*, 67 Wis.2d 176, 226 N.W.2d 518 (1975).

Many state courts have wrestled with the pension issue, particularly in the community property states, and they have all concluded that the problem is sufficiently intractable and complex as to defy any hard and fast rules. There does seem to be general agreement among a majority of courts that have considered the subject that the cynosure of satisfactory resolution of the problem involves the quickest possible disentanglement of the parties from one another's financial affairs and future income. Representative of other courts' thinking is *Rogers v. Rogers*, 45 Or.App. 885, 609 P.2d 877 (1980) *modified by Matter of Marriage of Rogers* 50 Or.App. 511, 623 P.2d 1108 review denied by *Rogers v. Rogers*, 642 P.2d 307 (Or.1981) where the court said:

"... [I]t is obvious there is no clear cut method of determining an award to the non-employee spouse which represents that spouse's interest in the retirement benefits ...

For example: (1) The distribution should generally be based on the contributions made during the marriage. (2) The courts should continue to strive to disentangle the parties as much as possible by determining, where equitable, a sum certain to be paid rather than a percentage based upon expected future contingencies. (3) In determining whether a lump sum award is appropriate, courts should consider the burden it would place on the paying spouse in view of required child support, spousal support, and other property distribution. (4) Where courts determine that the parties will share in the benefits on a proportional basis, the parties should also share the risks of future

---

10. *Matter of Marriage of Rogers*, 45 Or.App. 885, 609 P.2d 877, 884 (1980) review denied by, 642 P.2d 307 (Or.1981); *Carnaggio v. Carnaggio*, 475 So.2d 861 (Ala.Civ.App.1985); *D'Amato v. D'Amato*, 96 A.D.2d 849, 466 N.Y.S.2d 23 (Supt.Ct. 1983); *Coster v. Coster*, 452 N.E.2d 397 (Ct.App. 1983); *Sochor v. Internal Business Machines*

*Corp.*, 90 A.D.2d 442, 457 N.Y.S.2d 317 (2nd Dept.1982) order reversed 60 N.Y.2d 254, 469 N.Y.S.2d 591; 457 N.E.2d 696 (1983); *Spadaro v. New York City Police Pension Department*, 115 Misc.2d 494, 454 N.Y.S.2d 374 (1982); *In Re Marriage of Haftorson*, 49 Or.App. 205, 619 P.2d 655 (1980).

contingencies, *e.g.*, death of the employed spouse or delayed retirement of the employed spouse, and payment should be to the receiving spouse as the employed spouse receives the retirement pay. (5) Courts should consider, where appropriate, an award of a portion of retirement benefits where the other property awarded is not adequate to make an equitable distribution."

609 P.2d at 882, 883.[11]

In the case before us, of course, the circuit court has not yet had an opportunity to tackle the pension problem and, therefore, we remand with directions to hold a hearing and devise an appropriate plan that is consistent with these guidelines.

## IV

Finally, Mrs. Cross asserts that the circuit court erred in paragraph four of his final order when he provided:

"The plaintiff shall be entitled to claim the infant children as exemptions for federal and state income tax purposes, particularly in view of the fact that the defendant is currently unemployed, and such exemptions shall continue until further order of this Court."

This assignment of error raises a question of first impression in this Court: Do amendments to *IRC* § 152(e), occasioned by the Tax Reform Act of 1984, (P.L. 98–369,

98 Stat. 494), deprive our courts of the power to allocate the child dependency exemption for federal income tax purposes by requiring the non-custodial parent to execute the waiver required by *IRC* § 152(e)(2)(A)? Under prior tax law state courts could allocate the dependency exemption.[12]

Effective January 1, 1985, § 152(e) of the *IRC*, 26 U.S.C. § 152(e) (Supp. II, 1984) was amended to simplify the handling of dependency exemptions for the children of divorced parents. Under the prior law, unless otherwise specifically agreed to in writing by the parties or addressed in a court decree, the non-custodial parent could claim a dependency tax exemption if he or she paid more than $1,200 toward the support of a child in any calendar year and the custodial parent did "not clearly establish that he provided more for the support of such child during the calendar year than the parent not having custody." *IRC* § 152(e)(2)(B)(i) and (ii) (1982). Under the amendments effected by the 1984 Tax Act, the custodial parent is now *always* entitled to the dependency exemption unless he or she signs a written waiver[13] disclaiming the child as a dependent for a given tax year. *IRC* § 152(e)(2)(A) (Supp. II, 1984). Under the 1984 tax law, a written declaration signed by the custodial parent must now be attached to the noncustodial par-

**11.** Unfortunately, each jurisdiction creates its own body of law governing valuation methods and the law begins to sprawl accordingly. Some courts have held that unvested pensions without a definite value cannot be distributed, *In Re Marriage of Evans*, 85 Ill.2d 523, 55 Ill. Dec. 529, 426 N.E.2d 854 (1981); *Kundit v. Kundit*, 107 Ill.App.3d 310, 314, 63 Ill.Dec. 128, 437 N.E.2d 777 (1982); other courts will attempt to place a value on *any* pension right, *Holbrook v. Holbrook*, 103 Wis.2d 327, 309 N.W.2d 343 (Wis. App.1981); *Heatwole v. Heatwole*, 103 Wis.2d 613, 309 N.W.2d 380 (App.1981). However, not all courts look with favor on the method of present valuation, *In Re Marriage of Fairchild*, 110 Ill.App.3d 470, 66 Ill.Dec. 131, 442 N.E.2d 557 (1982); *Pelot v. Pelot*, 116 Wis.2d 339, 342 N.W.2d 64 (1983), nor do all courts agree about what to do with the discount rate when determining present value, *Di Pietro v. Di Pietro*, 183 N.J.Super. 69, 443 A.2d 244 (1982), order reversed 193 N.J.Super. 533; 475 A.2d 82 (1984); *Johnson v. Johnson*, 131 Ariz. 47, 638 P.2d 714

(Ariz.App.1980); *Murff v. Murff*, 601 S.W.2d 116 (Tex.Civ.App.1980) judgment reversed 615 S.W.2d 696 (1981); *In Re Marriage of Bodford*, 94 Ill.App.3d 91, 49 Ill.Dec. 633, 418 N.E.2d 487 (1981). Therefore, there is no fixed formula for making a disposition of property. *Fletcher v. Fletcher*, 615 P.2d 1218 (Utah 1980); *In Re Marriage of Pope*, 37 Colo.App. 237, 544 P.2d 639 (Colo.1975), *Elliott v. Elliott*, 274 N.W.2d 75 (Minn.1978); *Barbour v. Barbour*, 464 A.2d 915 (D.C.Ct.App.1983); *Reed v. Reed*, 93 A.D.2d 105, 462 N.Y.S.2d 73 (1983).

**12.** *See, Morphew v. Morphew*, 419 N.E.2d 770 (Ind.App.1981); *Pettitt v. Pettitt*, 261 So.2d 687 (La.App.1972); *Westerhof v. Westerhof*, 137 Mich.App. 97, 357 N.W.2d 820 (1984); *Greeler v. Greeler*, 368 N.W.2d 2 (Minn.App.1985); *Niederkorn v. Niederkorn*, 616 S.W.2d 529 (Mo.App. 1981).

**13.** Form 8332, "Release of Claim to Exemption for Child of Divorced or Separated Parents."

ent's tax return indicating a waiver of the dependency exemption by the custodial parent. *IRC* § 152(e)(2)(B) (Supp. II, 1984). The written waiver by the custodial parent of the dependency exemption may be made yearly, or in one written instrument covering a period of years, or it may be made in perpetuity.

Before the 1984 amendment to *IRC* § 152(e), the parent who provided the larger share of a child's actual support was entitled to the dependency exemption, although it was *presumed* that the non-custodial parent provided the larger share if $1,200 per year were paid for a dependent's support. The effect of the new *IRC* § 152(e) is that noncustodial parents who have been claiming a dependency exemption under the old $1,200 yearly payment rule are no longer able to do so regardless of how much child support they pay unless the custodial parent agrees in writing to permit the non-custodial parent to do so.

The commentators indicate that the purpose of the 1984 amendment to ·*IRC* § 152(e) was to remove from the Internal Revenue Service the burden of resolving numerous factual disputes between divorced parents over the issue of who actually provides more support for the child.[14] Such disputes arose when, under the previous law, the noncustodial parent paid more than $1,200 yearly as support.[15] Under the

amended *IRC* § 152(e), the criteria to be followed by the IRS is much more objective—the custodial parent always gets the exemption unless he or she has assigned it to the non-custodial parent through a written declaration on an official IRS form. Thus, under the new *IRC* § 152(e), a court order standing alone—without the necessary IRS waiver form—is ineffective to transfer the dependency exemption.

Contrary to the legislative history of the amended *IRC* § 152(e), Mrs. Cross maintains that the 1984 version of *IRC* § 152(e) was designed to confer, by federal law, a collateral financial benefit upon the custodial parent. Nothing, however, could be farther from the truth. What the new Code section sought to achieve was certainty in the allocation of the dependency exemption *for federal tax administration purposes.* By placing the dependency exemption in the custodial parent unless a waiver is executed, the new statute relieves the Internal Revenue Service of litigation.[16] The new statute is entirely silent concerning whether a domestic court can *require* a custodial parent to execute a waiver, and this silence demonstrates Congress's surpassing indifference to how the exemption is allocated as long as the IRS doesn't have to do the allocating.

The leading case squarely considering the applicability of the new *IRC* § 152(e) to

**14.** *See,* R.M. Barron, "Modification of Divorce Decrees by Virtue of the 1984 Tax Amendment Relating to Dependency Exemptions," 8 *U.A.L.R. Law Journal* 683; Ramble, "The Domestic Relations Tax Reform Act of 1983—New Rules, But Simple," 19 *Gonz.L.Rev.* 69.

**15.** One can easily understand the IRS's eagerness to amend *IRC* § 152(e) to establish some bright-line rules. Under the former IRC, § 152(e), a divorced custodial parent was entitled to claim the dependency exemption for each child except where: (1) the non-custodial parent obtained a written agreement or decree allocating the exemption to that parent and he or she provided at least $600 in support during the year [Former IRC § 152(e)(2)(A) ]; or (2) where the non-custodial parent provided at least $1,200 in support during the year and the custodial parent could not "clearly establish" that he or she furnished more support than the non-custodial parent [Former IRC, § 152(e)(2)(B) ].

**16.** *See,* The Legislative History of the Deficit Reduction Act (P.L. 98–369) reported in

H.R.Rep. 98–432, part II, 98th Cong., second sess. 3 (1984), reprinted in 1984 *U.S.Code Cong. and Ad.News* 697, 1140 which says:

Reasons for Change
The present rules governing the allocations of the dependency exemption are often subjective and present difficult problems of proof and substantiation. The Internal Revenue Service becomes involved in many disputes between parents who both claim the dependency exemption based on providing support over the applicable thresholds. The cost to the parties and the Government to resolve these disputes is relatively high and the Government generally has little tax revenue at stake in the outcome. The committee wishes to provide more certainty by allowing the custodial spouse the exemption unless that spouse waives his or her right to claim the exemption. Thus, dependency disputes between parents will be resolved without the involvement of the Internal Revenue Service.

support decrees is *Davis v. Fair,* 707 S.W.2d 711 (Tex.App.1986). In *Davis* a non-custodial father, Mr. Fair, was paying $750 per month per child for two children under a pre–1985 decree. The original decree had not specifically awarded Mr. Fair the dependency exemption, but after the new *IRC* § 152(e) went into effect, Mr. Fair went back to court to modify the decree to allocate him the dependency exemption or, alternatively, to have the court reduce the amount of his child support payments.

The Texas trial court ordered that Mr. Fair be allocated the dependency exemption, but the Texas Court of Appeals reversed. The court of appeals specifically held that Mr. Fair's divorce decree could not be converted to a "qualified pre-1985 instrument" as that term is defined in *IRC* § 152(e)(4)(B)(ii) through a subsequent modification order. Nonetheless, the court of appeals explicitly recognized that the new tax law might impose a "greater economic burden" upon Mr. Fair which required, in the interest of justice, that his case be remanded for a determination of his request for a *reduction of child support.*[17]

*Davis v. Fair,* is an extremely formalistic opinion that strains at a gnat but swallows a camel. The *Davis* court held that the trial court could adjust child support to reflect the lost value of the dependency exemption, but could not allocate the exemption to the non-custodial parent because there was no express authority in the *Internal Revenue Code* allowing it.

Indeed, under the new *IRC* § 152(e) a state court does not have the power to allocate the exemption simply by court order alone (as it could have done before the 1984 Amendment), but it does have the equitable power to require the custodial parent to sign the waiver.[18] In this regard, what the *Davis* court missed is that there is *no prohibition* —express or implied—on a state court's requiring the execution of the waiver, and because state court allocation of dependency exemptions has been custom and usage for decades, it is more reasonable than not to infer that if Congress had intended to forbid state courts from allocating the exemption by requiring the waiver to be signed, Congress would have said so. In this regard it is interesting to note that Texas was the one state that discouraged court-ordered allocation of the exemption under the old law. *See,* R.M. Baron, Op.Cit. Note 12.

Thus, we arrive at a conclusion diametrically opposed to *Davis v. Fair, supra,* because we find nothing in the 1984 amendment to *IRC* § 152(e) that precludes a power in our trial courts to award the dependency tax exemption as an integral part of setting child support *by ordering the custodial parent to execute the waiver* required by the *IRC.* In this regard, the U.S. Supreme Court has articulated two tests for determining whether there is a conflict

---

**17.** Our research indicates that only four other states to date have considered this issue since the 1984 amendment to *IRC* § 152(e) became effective and in no state has the issue reached a state's highest court. Two of the other cases considering the new *IRC* § 152(e) cited *Davis v. Fair, supra,* with approval, but then distinguished the cases before them on the facts and either allowed an allocation of the dependency exemption to the non-custodial parent or remanded for a factual determination of who paid more support. In *Seip v. Seip,* 725 S.W.2d 134 (Mo.App.1987) the court found a qualified, pre-1985 instrument allocating the exemption, and in *Gleason v. Michlitsch,* 82 Or.App. 688, 728 P.2d 965 (1986) the parties were never married and the court held that *IRC* § 152(e) applies only to parents who were once married. In *Fudenberg v. Molstad,* 390 N.W.2d 19 (Minn. App.1986) the Minnesota Court of Appeals held that the allocation of the exemption is permissi-

ble as the state court allocation does not interfere with the amendment's intent to avoid IRS involvement in fact finding determinations. This case asserts, as we do, that a state court has the authority to make such an equitable decision when a waiver is involved. *See also, Valento v. Valento,* 385 N.W.2d 860 (Minn.App.1986). Minnesota also asserts that when a waiver is not involved, federal law must be strictly followed as in *Gerardy v. Gerardy,* 406 N.W.2d 10 (Minn. App.1987) and *Theroux v. Boehmler,* 410 N.W.2d 354 (Minn.App.1987). Finally in *Lincoln v. Lincoln,* 155 Ariz. 272, 746 P.2d 13 (App.1987) the Arizona Court of Appeals held that a custodial parent may be ordered to execute the necessary waiver of exemption in favor of a non-custodial parent who is paying child support in appropriate cases.

**18.** *See Lincoln v. Lincoln, supra.*

between a federal statute and state law. The first of these tests provides that a conflict exists when "compliance with both federal and state regulations is a physical impossibility ..." *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). The second test provides that a conflict will be found when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941).[19]

Our holding today concerning a court's power to order a custodial parent to waive the dependency exemption meets both tests. *IRC* § 152(e) seeks only certainty; it requires a waiver to allocate the dependency exemption to the non-custodial parent and a court-ordered waiver is as acceptable as any other. The second test relating to congressional intent is also met: the amended *IRC* § 152(e) is designed to ease the IRS's administrative burden and not to rearrange economic benefits between divorced parents.

None of this discussion, however, is meant to imply that the new *IRC* § 152(e) does not provide valuable benefits to custodial parents even though providing those benefits was not its primary purpose. In the 94 percent of all divorces that are concluded by voluntary settlement, the custodial parent is given a new bargaining chip that, depending upon the economic circumstances, may be of significant value. Furthermore, when the dependency exemption is allocated to the non-custodial parent on a year-to-year basis the custodial parent must sign a waiver to allow the non-custodial parent to take the exemption. This simple mechanical requirement provides the custodial parent with an opportunity to collect back support payments every April 15th. In light of the low level of compliance with alimony and child support awards, this scheme hardly seems ill-conceived from points of view other than the IRS's.

Nonetheless, the question before us now is whether it is proper for a circuit court to allocate the dependency exemption for tax purposes as part of his decision about child support awards. We hold that it is. In a peculiar way, perhaps, *Davis v. Fair, supra,* is squarely on point. In *Davis* the court held that although a trial judge could not allocate the dependency exemption, he could reduce child support to reflect the value of the dependency exemption. If that is so, a court can do indirectly what Mrs. Cross would have us prohibit a court from doing directly. Take away $100 a month from Mrs. Cross's child support payments and she'll gladly execute a waiver to have the $100 a month restored; in her tax bracket the dependency exemption is nearly worthless.

The facts of life are that income tax exemptions are valuable only to persons with income, and up to a certain point, the higher the income the more valuable exemptions become because of the progressivity of the federal income tax. In this regard, it is to be remembered that the

---

19. *In Savings & Profit Sharing Fund of Sears Employees v. Gago,* 717 F.2d 1038 (7th Cir.1983), a state trial court's order directing former husband's private retirement fund to pay his former wife a portion of his retirement monies pursuant to a prior divorce decree was held not to be preempted by or in conflict with Employee Retirement Income Security Act (ERISA), since section 514(a) of ERISA that preempted "any and all state laws insofar as they they may now or hereafter relate to any employee benefit plan" covered by the Act was insufficiently specific to be seen as reasonably preempting all state laws that related to pensions under the Act. The court reasoned that section 206(a) of ERISA that prohibited assignments or alienation of benefits under covered plans was designed to protect employees from their own financial improvidence in dealing with third parties and to assure that the employee and his beneficiaries reap the ultimate benefits due upon retirement. Furthermore, the presumption that state domestic relations law was to be preserved was not rebutted as Congress did not speak to the particular subject of division of pensions between spouses and no federal interest in ERISA required non-recognition of state property distribution law. *See also, AT & T v. Merry,* 592 F.2d 118, 121 (2d Cir.1979); *Stone v. Stone,* 450 F.Supp. 919 (D.C.Cal.1978) aff'd. 632 F.2d 740 (9th Cir.1980), cert. denied 453 U.S. 922, 101 S.Ct. 3158, 69 L.Ed.2d 1004 (1981); *Carpenters Pension Trust Fund v. Kronschnabel,* 632 F.2d 745 (9th Cir.1980), cert. denied 453 U.S. 922, 101 S.Ct. 3158, 69 L.Ed.2d 1004 (1981).

federal government is not providing every custodial parent with a cash grant under *IRC* § 152(e). Rather, *IRC* § 152(e) provides an economic benefit that is of significantly greater value to a parent with income than it is to a parent without income. Consequently, it seems only reasonable that a trial judge should allocate the dependency exemption to the parent in the highest tax bracket, and then enhance (or reduce) the value of the cash child support payments to offset the value of the exemption. Furthermore, this interpretation of the law is entirely congruent with *W.Va. Code*, 48–2–16(b)(12) [1984] that specifically directs a court, in determining the amount of alimony, child support or separate maintenance, to consider "the tax consequences to each party." Certainly what can be done indirectly under any reading of the law by a circuit judge—namely, to adjust the award of child support depending on whether a waiver of the dependency exemption is made by the custodial parent, as in *Davis, supra,*—can be done directly.

This, however, is not to say that the custodial parent loses any of the benefits rightly conferred upon her by the new *IRC* § 152(e). When the circuit court orders that a custodial parent execute the waiver of the dependency exemption in favor of her former spouse, execution of the waiver is dependent upon a non-custodial parent's having paid his court-ordered child support. This gives the custodial parent leverage because she can refuse to execute the waiver in the event of non-payment, which forces the non-custodial parent to take her back to court to force the execution of the waiver, at which time she may raise the back payment issue.

For the reason set forth above concerning the circuit court's failure to include Mr. Cross's pension as marital property, this case is reversed in part and remanded for further proceedings consistent with parts II and III of this opinion.

Affirmed in part; reversed in part; remanded with directions.