585 S.E.2d 36

**In re: the Marriage of Marlene J. McGEE, Petitioner Below, Appellant,**

v.

**Louis L. McGEE, Respondent Below, Appellee.**

No. 30965.

Supreme Court of Appeals of West Virginia.

Submitted March 26, 2003.

Decided June 17, 2003.

John G. Ours, Petersburg, for the Appellant.

C. Page Hamrick, III, John I. Rogers, Anthony G. Halkias, Charleston, for the Appellee.

ALBRIGHT, Justice.

This is an appeal by Marlene J. McGee (hereinafter "Appellant") from an order of the Circuit Court of Mineral County directing that a three percent cost of living adjustment (hereinafter "COLA") be applied to her retirement, thereby raising the value of her retirement by $100,875.00 and substantially affecting her equitable distribution rights in her divorce from Louis L. McGee (hereinafter "Appellee"). The Appellant maintains that the lower court erred in applying the three percent COLA to her retirement account. She further maintains that she is entitled to attorney fees. The Appellee submits a cross assignment of error asserting that the lower court erroneously concluded that an interest in a partnership was marital property rather than separate property. Based upon thorough review of the briefs, arguments of counsel, and record in this matter, we reverse the lower court's determination with regard to the application of the COLA to the valuation of the retirement accounts, affirm the determinations regarding attorney fees and classification of the partnership interest as marital property, and remand for further proceedings consistent with this opinion.

## I. Factual and Procedural History

The Appellant instituted this divorce action in 1998. The family law master[1] appointed Dr. E. William Johnson, upon agreement by the parties, for the purpose of evaluating the present values of their respective retirements.[2] In January 1999, Dr. Johnson filed

[1] During the litigation of this matter, family law masters were replaced by family court judges, effective January 1, 2002. *See* West Virginia Constitution, Article VIII, § 16; W. Va.Code § 51–2A–23 (2000) (Supp.2002). Because the evaluations at issue in this case occurred under the family law master system and to maintain consistency with the proceedings underlying this appeal, we refer to Mr. Charles E. Parsons as a family law master in this opinion.

[2] The Appellant had served for twenty-seven years as a teacher in Mineral County under the West Virginia Teachers' Defined Benefit Plan.

The Appellee had served for thirty-one years under the United States Civil Service Retirement System. When the parties, through counsel, learned that it would be necessary to have their respective retirements evaluated for purposes of equitable distribution, they jointly moved the family law master to appoint a neutral expert appraiser. Thus, by agreed order dated December 2, 1998, the family law master appointed Dr. E. William Johnson to appraise or evaluate the retirement accounts of the parties. Counsel for the parties supplied Dr. Johnson with the necessary information regarding the retirement accounts.

**40**

a report valuing the Appellant's teachers' retirement at $242,286. Dr. Johnson did not apply a COLA based upon his conclusion that such addition was not appropriate. In March 1999, Dr. Johnson filed report valuing the Appellee's civil service retirement at $682,014, applying a three percent COLA.

In October 2000, the family law master entered an order recommending adoption of the retirement account values determined by Dr. Johnson. In response, the Appellee filed a petition for review, arguing that an equitable result could be accomplished by either applying a COLA to both parties' accounts or valuing those accounts without application of the COLA. The Appellee asserted that applying a COLA to his account while not applying a COLA to the Appellant's was inequitable. Based upon the Appellee's request, the lower court entered an order dated January 16, 2001, remanding the matter to the family law master and directing Dr. Johnson to apply a COLA to both parties' retirement accounts. Dr. Johnson thereafter submitted a July 2001 report, increasing the valuation of the Appellant's retirement account from $242,286, as originally computed, to $348,161, an increase of $105,875 incident to the application of the COLA to the Appellant's account.

On September 17, 2001, the family law master entered an order recommending Dr. Johnson's new findings based upon application of the COLA to both parties' accounts. The Appellant objected to this finding. Upon the institution of the new family court system, a January 15, 2002, order was entered applying the COLA to both retirement calculations. By order dated April 18, 2002, the lower court denied the parties' petitions for appeal and affirmed the family court judge order.

The Appellant appeals to this Court, contending that a COLA should not have been applied in the calculation of her retirement benefits. The Appellee cross-assigns error, alleging that a partnership known as Mountain Partnership should be categorized as separate property. The January 15, 2002, order had found that it was marital property, but the Appellee and the parties' son claim that the Appellee's interest in the partnership was originated with separate funds from the Appellee's father.

### I. Standard of Review

■ The standard of review with which we approach this matter has been consistently explained as follows: "In reviewing challenges to findings made by a family law master that also were adopted by a circuit court, a three-pronged standard of review is applied. Under these circumstances, a final equitable distribution order is reviewed under an abuse of discretion standard; the underlying factual findings are reviewed under a clearly erroneous standard; and questions of law and statutory interpretations are subject to a *de novo* review." Syl. Pt. 1, *Burnside v. Burnside*, 194 W.Va. 263, 460 S.E.2d 264 (1995). The legal issue of whether post-divorce increases in value of retirement accounts is separate or marital property and questions of proper valuation thereof are legal issues entitled to *de novo* review. With regard to the Appellant's contention that the lower court erred in awarding attorney fees, we review that matter under an abuse of discretion standard. *Banker v. Banker*, 196 W.Va. 535, 550, 474 S.E.2d 465, 480 (1996).

### III. Discussion

### A. Retirement Benefits

■ The sole issue before this Court is the allocation and distribution of the retirement benefits. This Court is not presented with other questions regarding the overall equitable distribution plan for these parties. We consequently confine our discussions to the division of the retirement benefits based upon the statutory presumption of an equal division of marital property between the spouses. *See* W. Va.Code § 48–7–101 (2001) (providing for equal division of marital property and stating: "Except as otherwise provided in this section, upon every judgment of annulment, divorce or separation, the court shall divide the marital property of the parties equally between the parties").

■ This Court previously addressed the classification of pension rights as marital property in *Cross v. Cross*, 178 W.Va. 563, 363 S.E.2d 449 (1987), and observed as fol-

lows in syllabus point four: "Although *W.Va. Code,* 48–2–1 [1984] and *W.Va.Code,* 48–2–32 [1984] did not specifically mention pension plans as marital property available for equitable distribution, these two *Code* sections were broad enough to encompass pension plans." The Court further observed that "[t]here is no fool-proof, scientific method regularly used by courts to divide retirement or pension benefits that have vested but not yet matured." *Id.* at 568, 363 S.E.2d at 454. This Court explained as follows in *Cross:*

> We hesitate to dictate any specific technique for distributing pension benefits at divorce because each pension plan case presents a different set of problems. Nonetheless, courts elsewhere have established some broad guidelines that can assist our trial courts in crafting systems to divide pension rights. Perhaps the cynosure in all the reported cases is the desirability of disentangling parties from one another as quickly and cleanly as possible.

*Id.* at 568, 363 S.E.2d at 454.

■ In syllabus point five of *Cross,* this Court summarized the method to be employed in dividing pension benefits as follows:

> When a court is required to divide vested pension rights that have not yet matured as an incident to the equitable distribution of marital property at divorce, the court should be guided in the selection of a method of division by the desirability of disentangling parties from one another as quickly and cleanly as possible. Consequently, a court should look to the following methods of dividing pension rights in this descending order of preference unless peculiar facts and circumstances dictate otherwise: (1) lump sum payment through a cash settlement or off-set from other available marital assets; (2) payment over time of the present value of the pension rights at the time of divorce to the non-working spouse; (3) a court order requir-

ing that the non-working spouse share in the benefits on a proportional basis when and if they mature.

■ The question presented in case sub judice, with regard to the applicability of a COLA to the valuation process, logically follows as an issue to be addressed within the framework enunciated in *Cross.* While this Court has not directly addressed the question presented, other jurisdictions analyzing this issue have concluded that the non-pensioner spouse in a divorce proceeding is entitled to share in COLA adjustments in retirement benefits applicable to the percentage of retirement benefits awarded to that spouse in the divorce order. *See Neese v. Neese,* 669 S.W.2d 388 (Tex.App. 11 Dist.1984); *In re Marriage of Bocanegra,* 58 Wash.App. 271, 792 P.2d 1263 (1990); *Thorpe v. Thorpe,* 123 Wis.2d 424, 367 N.W.2d 233 (1985). Such typical conclusion is premised upon the reasoning that such benefits constitute what is essentially passive appreciation of marital property,[3] not attributable to contributions made by the pensioner spouse subsequent to the divorce. Thus, the ultimate award in a deferred distribution is based upon a percentage of final benefits, rather than upon any calculation of the present value of such benefits at the time of separation. Where the parties are not attempting an immediate division of benefits and plan to divide the benefits at a later date, as in the present case,[4] this approach is particularly appealing. The well-reasoned authority of other jurisdictions addressing the issue of allocation and valuation of retirement benefits supports the conclusion that recipients of a fixed percentage of pension benefits enjoy post-separation increases in pension benefits since final division is deferred; however, immediate offset recipients do not receive post-separation increases such as cost of living adjustments because they obtain their share of retirement benefits, calculated based upon present value

---

3. "Put simply, if property is separate property, and it increases in value because of market forces or inflation (beyond the control of either party), then this passive increase in value is also separate property. It is obvious to this Court that the corollary also holds true; namely, if *marital* property increases in value due to market forces or inflation, then that passive increase in

value is also *marital* property." *Dababnah v. Dababnah,* 207 W.Va. 585, 589, 534 S.E.2d 781, 785 (2000).

4. Based upon information provided to this Court, it appears that both parties are nearing the age at which they could choose to retire.

at the time of separation, and the remaining benefits, including any changes therein, remain with the pensioner spouse.

An excellent example of such reasoning is found in *Bender v. Bender*, 258 Conn. 733, 785 A.2d 197 (2001), wherein the court identified three general categories of valuation and distribution of pension benefits: "(1) the present value method, also called the immediate offset method; (2) the present division method of deferred distribution; and (3) the reserved jurisdiction method of deferred distribution." *Id.* at 213. The *Bender* court explained that the present value or immediate offset[5] approach " 'requires the court to determine the present value of the pension benefits, decide the portion to which the nonemployee spouse is entitled, and award other property to the nonemployee spouse as an offset to the pension benefits to which he or she is otherwise entitled.' " *Id.* at 213, quoting 3 Family Law & Practice, § 36.13[3], p. 36—72. Under the present division method of deferred distribution, the court determines "at the time of trial, the percentage share of the pension benefits to which the nonemploy-ee spouse is entitled . . ." and "upon maturity, a fixed percentage of the pension [shall] be distributed to each spouse." *Id.* at 215. The *Bender* court specifically rejected the distribution method that requires a court to hold reserved jurisdiction until the employee's pension rights vest. *Id.* at 216.

The *Bender* court acknowledged that the "significant advantage to the deferred distribution approaches is that, because they delay distribution until the pension benefits have vested and matured, they impose equally on the parties the risk of forfeiture." *Bender*, 785 A.2d at 215 (citations omitted).

The Arkansas court, in *Brown v. Brown*, 38 Ark.App. 99, 828 S.W.2d 601 (1992), concluded that recipients of a fixed percentage of pension benefits enjoy post-separation[6] increases in pension benefits, reasoning as follows: "We find no valid reason for holding that the award of one-half of 90 percent of the gross retirement benefits does not carry with it the same portion of any COLA increases or decreases that occur subsequent to the divorce." *Id.* at 602. In that case, the

**5.** The *Bender* court explained the advantages and disadvantages of the immediate offset/present value approach as follows:

The present value approach has the advantage of effecting a severance of the parties' economic ties. See *Robert C.S. v. Barbara J.S.*, supra, 434 A.2d [383] at 388 [(1981)]; *Kikkert v. Kikkert*, supra, 177 N.J.Super. at 477–78, 427 A.2d 76 ("Although fixing present value under such circumstances may be difficult and inexact, nevertheless immediate final resolution of the method of distribution is to be encouraged, preferably by voluntary agreement whenever possible. Long term and deferred sharing of financial interests are obviously too susceptible to continued strife and hostility, circumstances which our courts traditionally strive to avoid to the greatest extent possible."); 3 Family Law and Practice, supra, § 36.13[3][a], p. 36–73. The present value approach also avoids extended supervision and enforcement by the courts, thereby saving the parties and the courts the time and expense of future litigation. See B. Turner, supra, § 6.11, p. 347; *Hunsinger v. Hunsinger*, 381 Pa.Super. 453, 460–61, 554 A.2d 89 (1989).

The major weakness of this approach is that it requires the court to base its division of the unvested pension benefits upon actuarial probabilities rather than actual events. B. Turner, supra, § 6.11, p. 347. It is possible, therefore, that, under the present value method, a pension, to which the court has assigned a present value and divided accordingly, will not be received by the owning spouse. This method therefore "places the entire risk of forfeiture before maturity on the employee spouse." *Krafick v. Krafick*, supra, 234 Conn. at 802, 663 A.2d 365[.]

*Bender*, 785 A.2d at 213.

**6.** West Virginia Code § 48–7–104(1) (2001) provides that the court shall determine the value of the "marital property of the parties as of the date of the separation of the parties or as of such later date determined by the court to be more appropriate for attaining an equitable result." The statute further provides:

Where the value of the marital property portion of a spouse's entitlement to future payments can be determined at the time of entering a final order in a domestic relations action, the court may include it in reckoning the worth of the marital property assigned to each spouse. In the absence of an agreement between the parties, when the value of the future payments is not known at the time of entering a final order in a domestic relations action, if their receipt is contingent on future events or not reasonably assured, or if for other reasons it is not equitable under the circumstances to include their value in the property assigned at the time of dissolution, the court may decline to do so; and (A) Fix the spouses' respective shares in such future payments if and when received; or . . . .

ex-wife was awarded a portion of the ex-husband's military retirement benefits earned during marriage and was entitled to a corresponding percentage share of cost of living adjustments. *Id.*

In *Seifert v. Seifert,* 319 N.C. 367, 354 S.E.2d 506 (1987), the North Carolina Court of Appeals also distinguished between immediate offsets, using present value calculations, and fixed percentage methods of property distribution of pensions. The court concluded that, under the fixed percentage method, "deferral of payment is possible without unfairly reducing the value of the award. The present value of the pension or retirement benefits is not considered in determining the percentage to which the nonemployee spouse is entitled." 354 S.E.2d at 509. "Moreover, because the nonemployee spouse receives a percentage of the benefits actually paid to the employee spouse, the nonemployee spouse shares in any growth in the benefits." *Id.* The percentage to which the nonemployee spouse is entitled is typically set at one half of the coverture fraction.[7] Where the immediate offset method is utilized, the present value of the pension benefits is calculated, and an immediate payout is required. The *Seifert* court disapproved a mixing of the present value method with the deferred payment method and concluded that calculating the present value of the retirement benefits but still not distributing them until a later date would result in a double reduction for present value. *Id.* at 509–10.

Calculation of present value was also determined to be unnecessary where there is no immediate distribution in *Tirmenstein v. Tirmenstein,* 539 N.E.2d 990 (Ind.Ct.App. 1989). The court explained as follows:

Here, the present value is irrelevant. The trial court chose not to give Bette an immediate right to receive some portion of the present value of Robert's pension benefit, either in a lump sum or over a period of years. In other words, the trial court did not divide the present value of Robert's pension. Instead, Bette was given the right to receive a percentage of what Robert receives when he receives it. . . .

539 N.E.2d at 993.

Similarly, in *Risoldi v. Risoldi,* 320 N.J.Super. 524, 727 A.2d 1038 (App.Div. 1999), *cert denied,* 161 N.J. 335, 736 A.2d 528 (1999), the New Jersey court recognized the two methods utilized by trial courts in equitably distributing pensions: the deferred distribution method and the present value/immediate offset method. *Id.* at 1045. "The major drawback of the present-value [immediate distribution] method is the difficulty inherent in fixing a present value for future benefits." *Id.* The *Risoldi* court held that "the present-value offset distribution method is only appropriate when there are sufficient other marital assets against which to offset the non-pensioner's equitable distribution interest in the pension, or sufficient income available to facilitate a reasonable buy-out of the non-pensioner spouse's interest." *Id.* at 1046.

The *Risoldi* court also discussed a third hybrid method employed in *Moore v. Moore,* 114 N.J. 147, 553 A.2d 20 (1989), involving a partial deferred distribution method to be used in "situations in which the future contingent benefit is not very likely to accrue. . . ." *Moore,* 553 A.2d at 26. The *Moore* court reasoned as follows:

The "partial deferred distribution" approach would entail a current valuation award of the appropriate share of the non-contingent portion of the pension and a deferred distribution of the share of the contingent benefits if and when they are

---

7. A coverture fraction is used to calculate the pension benefits attributable to the marriage and is determined as follows: the numerator is the length of time the employee participated in the pension plan during the marriage, and the denominator is the length of time the employee participated in the pension plan in total. For example, if the employee had been married twenty of the twenty-five years the pension was being accumulated, the coverture factor would be ⅘, and the ultimate distribution to the spouse might be one-half of only that ⅘ of the pension proceeds. Thus, the coverture fraction is multiplied by the total amount received by the employee spouse to determine the amount to which the non-employee spouse is entitled. The "sole purpose [of the coverture fraction] is to determine what part of the value of the plan is attributable to the years of marriage and hence marital property subject to equitable distribution." *Paulone v. Paulone,* 437 Pa.Super. 130, 649 A.2d 691, 694 (1994).

paid to the employee spouse.... This method of distribution would allow the non-employee spouse immediate enjoyment of part of his or her equitable distribution award and yet effectively protect his or her right to share future contingent benefits.

*Id.* at 26. The *Moore* court concluded that "[c]ourts must decide which to use based on sometimes competing considerations: the elimination of strife between the parties, the ease with which the present value of the pension may be ascertained, and the ability of the employee spouse to pay the non-employee spouse the current cash value of the pension." *Id.* at 27.[8]

Applying the *Moore* court's reasoning, the *Risoldi* court concluded that "[a]pplication of the coverture fraction, applied at the time the benefits convert to pay status at retirement, will assure [ex-husband] maintains the fruits of his post-divorce labor." *Risoldi*, 727 A.2d at 1049. The court explained its final holding as follows:

> In summary, this case involves a hybrid of the two basic methods of distributing the interest of the non-pensioner spouse, where a portion of that interest is distributed at the time of entry of the divorce judgment and a portion is distributed at the time the pension goes into pay status. We rule that the portion distributed at the time of divorce, through an offset against another asset or through a cash buy-out, must be valued using the present actuarial valuation method, reducing the future value of the pensioner's interest to present-value dollars. The deferred distribution of the remaining portion of the non-pensioner spouse's interest must be valued using a coverture fraction, multiplied by the non-pensioner spouse's percentage interest in the pension, and then multiplied by the amount of the pension benefit. Further, in accordance with the holding in *Moore*, 114

N.J. at 151, 553 A.2d 20, future post-retirement cost-of-living increases, limited to those attributable to the portion of the pension earned during the marriage, are distributable to the non-pensioner spouse in an amount equal to her percentage share at the time of the deferred distribution.

*Id.*

In *In re Marriage of Kelm*, 912 P.2d 545 (Colo.1996), the Colorado court explained its reasoning for the distinction between immediate offsets and deferred distribution. Referencing prior precedent established in *In re Marriage of Hunt*, 909 P.2d 525 (Colo.1995), the *Kelm* court stated that precedent had "held that if the pension is distributed upon dissolution under the net present value method, post-dissolution enhancements in essence are treated as separate property. This dichotomous treatment serves to compensate the nonemployee spouse for the delayed distribution and also the risks associated with the delay." *Kelm*, 912 P.2d at 550. As the *Hunt* court simply stated, "If the non-employee spouse must bear the risks attendant to waiting, then the nonemployee should share in increased benefits that accrue during the delay." 909 P.2d at 536.[9] The *Hunt* court further reasoned:

> We recognize that in certain cases post-dissolution increases in a pension should be treated as separate property. However, a pension qualifies for separate property treatment of post-dissolution increases only if the trial court can award the pension under the net present value theory at the time of dissolution. If the value of the pension cannot be divided at the time of dissolution but must be divided when it is received or could be received, then post-dissolution increases are marital property....

---

**8.** The *Moore* court also used the coverture fraction to determine the appropriate distribution of the cost of living increases.

**9.** *See also Ricketts v. Ricketts*, 109 Ohio App.3d 746, 754, 673 N.E.2d 156 (1996), explaining: "This method permits the nonparticipating spouse to share with the participating spouse in any increases or decreases in the value of the

pension after the divorce attributable to the continued participation of the participating spouse in the pension plan.... 'So long as each former spouse is limited to his or her proportionate right to share, there is neither unjust enrichment of the nonparticipant nor an inequitable deprivation of his or her rights.'" (Footnotes and citations omitted.)

*Id.* at 539. Where the present value/immediate offset method is utilized, "the nonemployee spouse exchanges future contingent post-dissolution enhancements for the benefits of immediate distribution. At the same time, the employee spouse reaps the benefit of potential enhancements that occur post-dissolution." *Id.*[10] The court reasoned as follows with regard to utilization of the deferred distribution method:

> If, however, the circumstances do not warrant immediate distribution because there are insufficient assets in the estate to permit offset, or the present value of the future benefit is too difficult to ascertain, the trial court may find it necessary to utilize either the deferred distribution or the reserve jurisdiction method. *See, e.g., [In re Marriage of] Gallo,* 752 P.2d [47] at 55[(Colo.1998)]; *In re Marriage of Nelson,* 746 P.2d 1346, 1349 (Colo.1987). Use of either of these methods increases the risks to the nonemployee spouse and entails differing levels of continued interaction between the parties and with the court. In consideration of the increased risks and the continued "economic partnership" between the parties under either of the delayed methods of distribution, post-dissolution enhancements always must be treated as marital property if distribution is delayed.

*Id.* at 540 (footnote omitted).

Trial courts typically have discretion in choosing the most appropriate methods of distributing the marital portion of pension benefits. In *Cohenour v. Cohenour,* 696 A.2d 201 (Pa.Super.1997), the Pennsylvania court recognized that the reviewing courts are charged with the responsibility to "balance the advantages and disadvantages of each distribution method according to the facts of each case, in order to determine which method best effects economic justice between the parties." 696 A.2d at 205.

Based upon the foregoing analysis, we conclude that trial courts must be provided with discretion regarding the method of distribution most appropriate in any given set of factual circumstances. Such discretion was acknowledged in *Cross* and has been consistently granted by other jurisdictions addressing these issues of division of pension benefits. *See Bender,* 785 A.2d at 216 ("We emphasize that the valuation and distribution methods that we have discussed of which the trial court may avail itself are not exclusive. Beyond the present case, however ... we do not pass on the validity of any method applied in a given case"). Despite the discretion instilled in trial courts, as necessary to sufficiently address individual factual scenarios, several foundational principles apply to all issues regarding division of pension benefits. First, where retirement benefits are distributed upon dissolution of marriage utilizing the immediate offset/present value method, all post-separation enhancements are classified as separate property. Where retirement benefits are allocated utilizing the deferred distribution method, the non-employee spouse is awarded a fixed percentage of retirement benefits to be distributed when such benefits mature.[11] To achieve the final division of retirement benefits when utilizing the deferred distribution method, post-separation enhancements are allocated between the employee spouse and the non-employee spouse. The amount of benefits to which the non-employee spouse is entitled is calculated by multiplying the

---

10. Most courts addressing the disadvantages of the immediate offset/present value method have recognized that a determination of the present value of the benefits is a very inexact science. A present value is determined using actuarial assumptions regarding the pensionholder's projected life expectancy. Such projections are based upon averages; thus, the calculation of the present value of the benefits will be correct based upon the average case. If, however, the pensionholder would die before he/she reaches retirement age, the spouse would have received his/her interest in the retirement benefits; yet, the benefits would never have been actually received by the pensionholder. Some of these uncertainties can be avoided by utilization of the deferred compensation method.

11. The delay inherent in the deferred method of valuing and allocating retirement benefits permits benefit enhancements, such as cost of living adjustments, to be divided based upon the fixed percentage awarded to the non-employee spouse and utilizing the coverture fraction as the mathematical formula through which final division of benefits is achieved.

fixed percentage [12] of retirement benefits by the coverture fraction. The coverture fraction is the ratio of the number of years of employment during the marriage prior to the separation of the parties to the total number of years the employee spouse has been employed under the pension plan being addressed.[13]

Thus, in the present case, we conclude that the lower court erred in applying the three percent cost of living adjustment to the parties' retirement accounts in the calculation of the value of those accounts. Upon remand, if the lower court determines that circumstances warrant utilization of the immediate offset/present value method of distribution, such benefit enhancements shall not be included. If, however, circumstances warrant a deferred distribution of the benefits, the cost of living adjustments will be reflected in the ultimate allocation of benefits, utilizing the deferred distribution method explained above.

### B. Mountain Partnership and Attorney Fees

█ The Appellee asserts that the lower court committed error by finding that the Appellee's interest in the Mountain Partnership was marital property rather than separate property. The Appellee contends that the evidence indicates that the property was acquired by the Appellee through a gift from the Appellee's father. While the Appellee testified that the funds used to purchase the partnership interest were a gift from his father, the Appellee was unable to demonstrate that particular funds were conveyed, that those funds became the Appellee's separate property, or that such funds were in actuality used to purchase the partnership interest.

This factual scenario is not entirely dissimilar from a situation in which one spouse received a monetary gift, as separate property, and subsequently commingles the funds with other marital property funds. In *Mayhew v. Mayhew*, 197 W.Va. 290, 475 S.E.2d 382 (1996), the wife asserted that certain shares of stock should be considered marital property because they were "commingled in a single certificate with ten shares which clearly were purchased during marriage with marital funds and which clearly were marital property." 197 W.Va. at 298–99, 475 S.E.2d at 390–91. This Court observed that "[t]he legal argument that such commingled separate shares become marital property is based upon the theory of 'transmutation', addressed by this Court in *Miller v. Miller*, 189 W.Va. 126, 428 S.E.2d 547 (1993)." *Id.* at 299, 475 S.E.2d at 391. Similarly, the lower court in case sub judice concluded that the Appellee had presented inadequate evidence that any gift from his father retained the character of separate property and was used to purchase separate property in the form of a partnership interest.

█ Our review of the lower court's factual finding is based upon a clearly erroneous standard; under these circumstances, this Court cannot conclude that the family law master and circuit court were clearly wrong in their factual finding with regard to the status of the Mountain Partnership. We find no definitive evidence that the Appellee's father paid for this interest in Mountain Partnership. This Court "will accord great deference to findings of fact by a family law master." *Porter v. Bego*, 200 W.Va. 168, 173, 488 S.E.2d 443, 448 (1997). We consequently decline to reverse the lower court's final order in this regard.

---

**12.** The fixed percentage will customarily be fifty percent, pursuant to the statutory presumption of equal division of marital property, as referenced above. Utilization of the percentage, rather than a specific monetary amount, avoids the problems inherent in calculating the present value of the benefits. The only time the present value would have to be calculated under the deferred distribution method would be where other factors are present, such as the need to use only a portion of a retirement benefit to equalize the overall equitable distribution of marital assets. To this Court's knowledge, such extenuating factors are not present in the case before us. If the fixed percentage were to be assigned in a manner other than the fifty percent equal division, issues of present value would be reactivated, presenting valuation problems beyond the scope of this opinion.

**13.** The coverture fraction automatically adjusts for such factors as length of time the parties were married while the pensioner worked under the pension plan being addressed.

The Appellant's additional assertion involved the lower court's denial of the Appellant's request for reimbursement of attorney fees. The lower court denied such reimbursement based upon the fact that the Appellant did not prevail on the issue of valuation of pension plan assets. Reviewing this matter under an abuse of discretion standard, we conclude that the lower court did not abuse its discretion in failing to award attorney fees to the Appellant. The issues of valuation and distribution of pension benefits was a legitimate matter; the Appellee did not assert unfounded claims which caused the Appellant excessive attorney fees; and there has been no indication that the Appellant is financially unable to pay the incurred attorney fees. We therefore find no abuse of discretion on the attorney fee issue.

For the foregoing reasons, we affirm in part, reverse in part, and remand this matter to the lower court for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.