475 S.E.2d 382

**Nancy H. MAYHEW, Plaintiff Below, Appellant,**

v.

**Robert E. MAYHEW, Defendant Below, Appellee.**

**No. 23263.**

Supreme Court of Appeals of West Virginia.

Submitted May 2, 1996.

Decided July 5, 1996.

Dissenting Opinion of Justice Workman July 19, 1996.

Ward D. Stone, Jr., Spilman, Thomas & Battle, Morgantown, for Appellant.

William H. Judy, III, Judy & Judy, Moorefield, for Appellee.

ALBRIGHT, Justice:

This is an appeal by Nancy H. Mayhew from a final order entered by the Circuit Court of Hampshire County in a divorce proceeding. On appeal, the appellant claims that the circuit court erred in holding that twenty-four shares of Mayhew Chevrolet–Oldsmobile, Inc., titled in the name of her husband, the appellee, Robert E. Mayhew, were his separate, nonmarital property and that the circuit court also erred in valuing certain other shares of Mayhew Chevrolet–Oldsmobile, Inc., which were declared to be marital property. The appellant at another point claims that the trial court erred in failing to award her permanent alimony and in failing to award her rehabilitative alimony which would extend beyond her death in the event she died within the period of such rehabilitative alimony. She additionally claims that the circuit court erred in failing to award her full legal and accounting fees and that the court erred in deducting certain payments made by her husband for mortgage payments and car payments during the pendency of the divorce from her equitable distribution share. Lastly, she claims that the circuit court erred in failing to order both parties to exchange financial information until the parties' youngest child turned eighteen years of age.

The appellant, Nancy H. Mayhew, and the appellee, Robert E. Mayhew, were married on April 28, 1979. Shortly thereafter, they purchased a farm house on a one-acre tract in Romney, Hampshire County, West Virginia, and they resided there until Robert E. Mayhew moved out of the marital home in May, 1993.

During all but a brief time during the parties' marriage, Robert E. Mayhew worked for Mayhew Chevrolet–Oldsmobile, Inc., which previously known as Pancake Motors, located in Romney, West Virginia. Robert E. Mayhew's father, James Mayhew, was originally a part owner of the dealership, and later he acquired full ownership.

During the first four years of the parties' marriage, Nancy H. Mayhew worked at various jobs which paid minimum wage or slightly above minimum wage. The parties' first child, Elizabeth Anna Mayhew, was born on August 30, 1983, and their second child, Hillary Leigh Mayhew, was born on April 5, 1986. After the birth of the first child, the appellant became a full-time mother and homemaker. She continued as a full-time mother and homemaker during the rest of the parties' marriage.

On January 2, 1985, Robert E. Mayhew's father gave Robert E. Mayhew eight shares of the one hundred twenty-five outstanding shares of Mayhew Chevrolet–Oldsmobile, Inc., (or its predecessor Pancake Motors) as a gift. In May, 1988, Robert E. Mayhew purchased an additional ten shares of Mayhew Chevrolet–Oldsmobile, Inc., for $2,200.00 per share. At that time, according to the corporate minutes, an additional two shares were given to Robert E. Mayhew as a gift by his father. The corporate minutes also show that on January 4, 1989, James Mayhew gave Robert E. Mayhew seven additional shares, valued at $2,200.00 per share, and on January 3, 1990, he gave Robert E. Mayhew a

further seven shares. After the 1990 transaction, Robert E. Mayhew held thirty-four shares of the one hundred twenty-five shares of Mayhew Chevrolet–Oldsmobile, Inc., stock, and Robert E. Mayhew's father, James Mayhew, owned the remaining ninety-one shares.

In February, 1990, after the last gift of stock to Robert E. Mayhew, a major fire erupted at the Mayhew Chevrolet business location in downtown Romney, West Virginia. In that fire, the dealership's garage burned to the ground. It appears that following the fire Robert E. Mayhew and his father were at odds as to the course of action to be taken with regard to the dealership. Robert E. Mayhew was of the view that a parcel of land outside town should be purchased and that the dealership should be moved away from the downtown area. James Mayhew apparently did not agree.

Ultimately, the dealership was moved to the location outside of town, and in December, 1991, the corporation, Mayhew Chevrolet–Oldsmobile, Inc., purchased James Mayhew's ninety-one shares of the corporation for $250,000.00. The ninety-one shares became treasury stock, and at that point Robert E. Mayhew held all thirty-four shares of outstanding stock. In effect, Robert E. Mayhew became the sole owner and made all business decisions with regard to the operation of Mayhew Chevrolet.

Late in 1992, Nancy E. Mayhew learned that Robert E. Mayhew was possibly involved in an intimate relationship with another female. Nancy H. Mayhew confronted Robert E. Mayhew over this matter, and he did not deny the relationship, but indicated that he wanted a divorce. Shortly thereafter, he moved out of the marital home.

Divorce proceedings were subsequently instituted, and a temporary order was entered on October 13, 1993. In the temporary order, Nancy H. Mayhew was awarded legal custody of the parties' two children, exclusive possession of the marital home, child support in the amount of $875.00 per month, and alimony in the amount of $500.00 per month. Robert E. Mayhew was additionally required to pay all marital indebtedness on a monthly basis.

Pursuant to the temporary order, Robert E. Mayhew paid the mortgage on the parties' marital home in the amount of $402.01 per month. He also made a car payment in the amount of $142.17 per month, paid the utilities for the marital home, and paid health-related expenses for the two children and Nancy H. Mayhew.

Prior to actual trial of the issues in the case, the parties stipulated as to the ownership and value of their assets, except for the ownership and value of the thirty-four shares of Mayhew Chevrolet–Oldsmobile titled in the name of Robert E. Mayhew. As a consequence, the only actual equitable distribution issue during trial of the case was the value of Robert E. Mayhew's thirty-four shares of Mayhew Chevrolet–Oldsmobile, Inc.

During the trial of the case, Robert E. Mayhew took the position that of the thirty-four shares of Mayhew Chevrolet–Oldsmobile, Inc., stock which he held, twenty-four shares were his separate property, since those shares of stock had been transferred to him as gifts by his father, James Mayhew. He conceded that his remaining ten shares of Mayhew Chevrolet–Oldsmobile, Inc., stock were marital property, since they were purchased during marriage.

Nancy E. Mayhew took the position that, even though it appeared that the twenty-four shares which Robert E. Mayhew claimed as separate property had been given to Robert E. Mayhew by his father, the facts suggested that the gift stock had actually been consideration for work performed by Robert E. Mayhew for the Chevrolet dealership. The appellant adduced evidence, and on appeal argues, that the record shows that in 1985 Robert E. Mayhew's total salary was only $28,748.95, and in 1986 it was $32,792.00. On January 2, 1985, the first eight shares of Mayhew Chevrolet–Oldsmobile, Inc., stock were allegedly given to Robert E. Mayhew. She further points out that for the first eight months of 1988 Robert E. Mayhew had a salary of $28,000.00 and that his salary for the full year of 1989 was $49,664.00. Seven additional shares of stock were transferred to Robert E. Mayhew on January 4, 1989, and another seven shares were transferred on

January 3, 1990. For the year 1990, Robert E. Mayhew's salary was reduced to $42,000.00.

Evidence was also adduced showing that after Robert E. Mayhew had obtained complete control of the corporation, a single new stock certificate was issued to him, in his name alone, for the thirty-four shares of stock in the corporation which he held, the twenty-four shares which he claimed were gift shares, as well as the ten shares which were purchased during marriage. During trial and on appeal, Nancy H. Mayhew takes the position that when the gift shares were joined with the purchased shares in the issuance of the single new stock certificate, there was, in effect, a commingling of gift shares, if they were in truth a gift, with marital property and that, as a consequence, the gift shares, even if they originally were intended as gifts, became marital property.

To counter Nancy H. Mayhew's contention that the gift shares were not in truth gifts, Robert E. Mayhew introduced evidence indicating that at the time of the gifts to him, his father, James Mayhew, also gave his brother certain other assets of considerable value, although no stock. Additionally, he adduced corporate minutes which indicated that the shares were, in fact, gifts. To counter Nancy H. Mayhew's argument that the gifts of stock were actually transfers of assets made in lieu of salary, Robert E. Mayhew pointed out that all gifts of stock were made before his salary was, in fact, reduced. He also indicated that the reduction in his salary which occurred was made after the fire destroyed the corporation's facility in downtown Romney and that a reduction was required to provide sufficient funds for rebuilding the dealership. He also showed that James Mayhew, his father, and at the time the majority owner of the business, also took a reduction in salary for the same reasons.

Relating to the question of the value of the shares of Mayhew Chevrolet–Oldsmobile, Inc., stock, Nancy H. Mayhew called as a witness Don Conley, who testified that, based on the net equity method, capitalization of earnings method, and cash flow method, the thirty-four shares of Mayhew Chevrolet–Oldsmobile, Inc., stock held by Robert E. Mayhew at the end of 1993 were worth $771,800.00. Robert E. Mayhew's expert, Judith Schubert, using the net equity method, capitalization of earnings method, and sales method, estimated that the thirty-four shares of stock were worth $458,949.00. Ultimately, the family law master concluded, and the circuit court agreed, that the value of the thirty-four shares was $648,586.00, or about $19,076.00 per share. The value thus determined may be assigned $190,760.00 to the ten shares purchased with marital assets and $457,826.00 to the twenty-four gift shares at issue below.

During the proceedings, although the parties did not dispute the other property distribution questions, Nancy E. Mayhew did testify that as of August 25, 1994, her legal and accounting fees were approximately $15,000.00. Later, she submitted an itemized bill from her attorney for attorney fees in the amount of $31,585.65 for services through March 16, 1995.

In resolving the issues in the case, the family law master prepared recommended findings of fact and conclusions of law. In addition to requiring Robert E. Mayhew to pay child support in the amount of $996.00 per month and medical and other expenses for the children, the family law master recommended that Nancy H. Mayhew receive $500.00 per month as rehabilitative alimony for a period of forty-eight months, beginning on October 1, 1994. The family law master also indicated, contrary to the wishes of Nancy H. Mayhew, that the rehabilitative alimony end at the death of either of the parties or upon the remarriage of Nancy H. Mayhew. The family law master also found, in effect, that twenty-four of the thirty-four shares of Mayhew Chevrolet–Oldsmobile, Inc., were the separate property of Robert E. Mayhew and awarded him the remaining ten marital shares of the corporation. The family law master recommended that Nancy H. Mayhew receive one-half of $174,425.00 for her one-half marital interest in those ten shares. In arriving at this figure, the family law master deducted from the $190,760.00 value assigned to the ten marital property shares the sum of $16,335.00, being amounts expended by Robert E. Mayhew which he had been required

to pay for the joint benefit of the parties during the pendency of the proceedings, over and above the alimony, child support, and suit money ordered paid to or for the benefit of Nancy H. Mayhew.

The propriety of the family law master's findings and recommendations were submitted to the trial court. In its final order, the court first found that the value placed on the Mayhew Chevrolet–Oldsmobile, Inc., stock was supported by the evidence and was not clearly wrong. In reaching that conclusion, the court detailed the evidence adduced on the value of the stock, and, in consideration of that evidence, approved and adopted the family law master's recommendation on the valuation of the stock.

The court also agreed with the family law master's determination that the twenty-four shares of stock were actually gifts. The trial court said:

He [the family law master] reviewed the corporate records and heard the witnesses, none of whom effectively disputed that the shares were a bona fide gift by a father to his son of shares of stock as was the gift by the father to another son of an automobile and monies at or near the same time, so long as both sons worked with him in the agency. The Master correctly found the 24 shares to be a gift and not payment to Defendant of added compensation over and above his salary for services performed. Also, the Master correctly refused to apply the transmutation theory so as to hold the 24 shares as marital property. The mere issuance of a new stock certificate which represented all the shares theretofore acquired over a period of time by a shareholder does not alter the status of the nature of the acquisition of such shares. In this case the new certificate was issued on advice of counsel in a restructuring of the corporate records during a reorganization of the company. Never did there exist any intent to change the nature of ownership of the shares, but rather only to consolidate and clean up the business records. The Master would have had to stretch the evidence considerably to find support for either the added compensation theory or that of transmutation.

The father may have recognized and appreciated the work by the son, but they disagreed on the manner in which the business should be operated, and the business was not growing and expanding under the father's method of operation. Defendant quit the company for a time and upon his return, he obtained more control in the operation of the business and under his method, the business again began to grow and prosper. The father recognized the change and terminated his interest so that Defendant would have complete control and responsibility.

The Master correctly found from the evidence that the 24 shares and all increases in the value thereof were non-marital property and were truly the result of a gift by a father to his son.

The court also addressed the question of whether the master properly awarded Nancy H. Mayhew rehabilitative alimony rather than permanent alimony and whether the master erred in failing to provide that the rehabilitative alimony would extend beyond the untimely death of Robert E. Mayhew.

The court found that the record indicated that Nancy H. Mayhew had a four-year Board of Regents degree, was in good health, and, although she had been a homemaker during her marriage, she was fully capable of entering the job market. The court also found that she had elected to train for a career as a court reporter. The court further noted that the evidence suggested that both parties were somewhat at fault in the breakup of the marriage and that Robert E. Mayhew, because of his devotion to his business interests, had been away from home more and more and that he had associated with friends other than his wife. The court concluded that this conduct had created the suspicion on the part of the appellant that he had committed adultery. Although the court found that the evidence was not sufficient to show adultery, the court recognized that the husband's relationship with another female was such as to be a partial cause of the termination of the marriage. On the other hand, the court also found that the evidence showed that Nancy H. Mayhew had, whether intentionally or not, interfered with the par-

ties' children's relationship with their paternal grandparents and that Nancy H. Mayhew, during the pendency of the divorce, had unnecessarily incurred expenses on her home to update it when she believed that it would be conveyed to her and that she had also incurred expenses with a competitor of her husband for the repair of her automobile and for new tires for her automobile. The court also found that the evidence suggested that Nancy H. Mayhew's motivation for revenge was alive and strong. The court concluded:

> No doubt the Master recognized this mutual fault and rightly concluded that each party was well provided for so that neither was entitled to permanent alimony from the other. The election by Plaintiff to seek a career as a Court Reporter likely is why the Master awarded rehabilitative alimony at all. His finding in this regard is believed to be generous, but under all the circumstances, will not be disturbed. Upon review of the assets of each party and the nature thereof, and it appearing the Defendant is borrowing money to meet his obligations, the Master was correct in not ordering a lump sum payment of rehabilitative alimony.
>
> Inasmuch as the court agrees with the Master's finding that permanent alimony will not be awarded, the question of such extending beyond the death of Defendant is moot.

In addressing the question of suit money, the court noted that the itemization for attorney fees and charges filed by Nancy H. Mayhew included much which had been incurred for matters which were unnecessary and which should not have been incurred. The court stated:

> It is apparent that Plaintiff went out of her way to attempt to gig Defendant with costs for many items for herself and to salve the sore she thinks only Defendant caused. When the financial ability of each of the parties is considered, along with the costs and expenses of each, it would be the inclination of the Court that each should pay his or her own attorney fees and costs without the other being compelled to contribute thereto. However, the Master thought otherwise, and his findings cannot

be said to be clearly wrong, therefore, are affirmed and adopted. However, no additional amounts will be awarded either party for attorney fees or costs.

## STANDARD FOR REVIEW

■■■ In syllabus point 1 of *Burnside v. Burnside,* 194 W.Va. 263, 460 S.E.2d 264 (1995), this Court stated:

> In reviewing challenges to findings made by a family law master that also were adopted by a circuit court, a three-pronged standard of review is applied. Under these circumstances, a final equitable distribution order is reviewed under an abuse of discretion standard; the underlying factual findings are reviewed under a clearly erroneous standard; and questions of law and statutory interpretations are subject to a *de novo* review.

The Court has also stated, with regard to alimony:

> Questions relating to alimony and to the maintenance and custody of the children are within the sound discretion of the court and its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused.

Syllabus, *Nichols v. Nichols,* 160 W.Va. 514, 236 S.E.2d 36 (1977). *See also Marilyn H. v. Roger Lee H.,* 193 W.Va. 201, 455 S.E.2d 570 (1995); *McVay v. McVay,* 189 W.Va. 197, 429 S.E.2d 239 (1993); and *Martin v. Martin,* 187 W.Va. 372, 419 S.E.2d 440 (1991).

■■■ Lastly, with regard to court costs and attorney fees, the Court has ruled:

> " ' "In a suit for divorce, the trial [court] . . . is vested with a wide discretion in determining the amount of . . . court costs and counsel fees, and the trial [court's] . . . determination of such matters will not be disturbed upon appeal to this Court unless it clearly appears that he has abused his discretion." Syllabus point 3, *Bond v. Bond,* 144 W.Va. 478, 109 S.E.2d 16 (1959).' Syl. Pt. 2, *Cummings v. Cummings,* 170 W.Va. 712, 296 S.E.2d 542 (1982)."

Syl. pt. 4, *Ball v. Wills,* 190 W.Va. 517, 438 S.E.2d 860 (1993).

## VALUATION OF SHARES OF STOCK

Nancy H. Mayhew claims that the circuit court erred in establishing the value of the ten shares of stock which were determined to be marital property.

An examination of the record shows that the court valued the entire thirty-four shares of stock which were in the hands of Robert E. Mayhew at the time of this proceeding at $648,586.00. It appears that the court placed a value on the entire thirty-four shares since a number of experts were called who valued the shares as a whole. This Court notes that the value placed on the shares was considerably above the value placed on the shares by Robert E. Mayhew's expert, Judith Schubert, who found the shares to be worth $458,-949.00. The value, on the other hand, was somewhat lower than the $771,800.00 value placed on the shares by Nancy H. Mayhew's witness, Don Connelly.

█ It appears that there was extensive evidence on the value of the shares presented by expert evaluators of such property, that such expert evaluators used appropriate methods for valuing the property, and that the family law master resolved the conflict in the evidence in that regard properly and valued the shares in a manner consistent with the evidence of value advanced by the evaluators. This Court cannot conclude that the findings of fact made by the family law master and the circuit court as to the value of the shares were clearly wrong. Accordingly, under the rule set forth in *Burnside v. Burnside, supra,* the circuit court's ruling is affirmed.

## GIFT SHARES

As previously indicated, in the present proceeding Nancy H. Mayhew is claiming that the trial court erred in finding that twenty-four shares of Mayhew Chevrolet–Oldsmobile, Inc., stock titled in the name of Robert E. Mayhew were his separate property and were not marital property.

In reviewing the evidence relating to the ownership of the twenty-four shares of Mayhew Chevrolet–Oldsmobile, Inc., stock in issue under this assignment of error, the Court notes that Robert E. Mayhew adduced evidence showing that those twenty-four shares were gifts from his father. Nancy E. Mayhew took issue with this and claimed that, although they outwardly appeared to be gifts, Robert E. Mayhew received a low salary while working for his father and that the salary was actually reduced shortly after he received his last gift of shares. Robert E. Mayhew countered this by introducing evidence suggesting that his brother had received gifts of other property at the same time he received gifts of stock. He also introduced evidence indicating that his salary was reduced, as was his father's salary at the same time, due to the fact that the corporation had suffered severe losses from a devastating fire and needed to restore its financial standing.

West Virginia Code § 48–2–1(f) defines separate property as, among other things, property acquired by a party during marriage by gift. Specifically, the relevant portion of the statute provides:

"Separate property" means:

\* \* \* \* \* \*

(4) Property acquired by a party during marriage by gift, bequest, devise, descent or distribution. . . .

█ In reviewing the evidence relating to the "gift" shares of stock involved in the present case, the Court notes that the evidence indisputably shows that the shares were obtained by Robert E. Mayhew from his father. There was evidence that they were transferred as a gift and that at the same time a gift was made to Robert E. Mayhew's brother. Although the evidence relating to Robert E. Mayhew's salary was conflicting and potentially could have supported a finding that the shares were not in fact gift shares, the family law master and the circuit court adopted the finding that that evidence did in fact show that they were intended as gift shares and concluded that the twenty-four shares were gifts to Robert E. Mayhew. We cannot say that the findings of the family law master and the circuit court in this regard are clearly wrong.

Nancy E. Mayhew also suggests that the twenty-four shares should be considered marital property because they were commin-

gled in a single certificate with ten shares which clearly were purchased during marriage with marital funds and which clearly were marital property.

█ The legal argument that such commingled separate shares become marital property is based upon the theory of "transmutation", addressed by this Court in *Miller v. Miller*, 189 W.Va. 126, 428 S.E.2d 547 (1993). In that divorce case, the husband's mother had deeded her farm to the husband, in his name only, during his marriage, for "love and affection". The husband and wife had invested marital assets in the construction of outbuildings and other improvements on the farm and had also invested martial assets in the improvement of the house constituting the marital domicile, which was located on the farm. Before this Court, the wife argued that because the improvements to the farm and the house constituted marital property and were, of necessity, commingled with the farm, the separate interest of the husband in the farm, acquired by the gift of his mother, had become marital property by transmutation. In *Miller v. Miller, supra*, we recognized the theory set forth in syllabus point 1 of *Kuehn v. Kuehn*, 55 Ohio App.3d 245, 564 N.E.2d 97 (1988), as follows: " 'This transformation may be effected by an agreement between the parties or by the affirmative act or acts of the parties.' *Westbrook v. Westbrook*, 5 Va.App. 446, 364 S.E.2d 523, 528 (1988)." *Miller v. Miller*, 189 W.Va. at 130, 428 S.E.2d at 551. We also said in *Miller*: " '[A] transmutation occurs when the contributing spouse evidences his intent to make a gift of the nonmarital property to the marriage by significantly changing the character of the property to marital.' *In re Marriage of Nicks*, 177 Ill.App.3d 76, 126 Ill.Dec. 442, 444, 531 N.E.2d 1069 [1071] (1988)." *Miller*, 189 W.Va. at 130, 428 S.E.2d at 551. However, the *Miller* Court refused to find a transmutation, saying: "In the case before us, however, there was no agreement effected between the parties, nor was there evidence of any intent by the appellee to change the character of the property. For instance, the appellee did not transfer title of his separate property in the joint names of both parties." *Id.*

█ This Court also addressed transmutation in *Whiting v. Whiting*, 183 W.Va. 451, 396 S.E.2d 413 (1990). In that case, the intent to make a gift of the separate property to the marriage was evidenced by a prior transfer of the separate property to the joint names of the parties. In syllabus point 4 of that case, we held:

> Where, during the course of the marriage, one spouse transfers title to his or her separate property into the joint names of both spouses, a presumption that the transferring spouse intended to make a gift of the property to the marital estate is consistent with the principles underlying our equitable distribution statute.

In *Whiting*, the Court recognized that the joint titling of previously separate property gives rise only to a rebuttable presumption of a gift to the marital estate, and the Court outlined factors which would overcome the presumption. Specifically, the Court stated:

> The presumption may be overcome by a showing that the transferring spouse did not intend to transfer the property to joint ownership or was induced to do so by fraud, coercion, duress, or deception. *See Bonnell v. Bonnell*, [117 Wis.2d 241, 344 N.W.2d 123 (1984) ]; *Trattles v. Trattles*, 126 Wis.2d 219, 376 N.W.2d 379 (App. 1985).

183 W.Va. at 459, 396 S.E.2d at 421 (footnote omitted).

In the present case, there is no transfer of title to the joint names of the parties, and thus the essential predicate of *Whiting*, the titling of the property in joint names, is not present.

█ The extent of any commingling of marital property with separate property is that ten shares of stock clearly subject to definition as marital property were evidenced on the same stock certificate evidencing the ownership of twenty-four shares transferred to Robert E. Mayhew by gift, and the resulting single certificate remained in the sole name of the legal owner of those shares, Robert E. Mayhew. By introducing evidence that the ten marital shares were combined with the twenty-four gifts shares in a single certificate solely because of a corporate reor-

ganization, Robert E. Mayhew adduced evidence which was sufficient, if believed by the fact finder, to support a conclusion that the reissuance of a single certificate representing all thirty-four shares was for a separate business purpose and evidenced no intention to make a marital gift of the separate shares to Nancy H. Mayhew. In determining that the twenty-four shares retained their character as separate property, it rather clearly appears that the family law master and the circuit court believed the evidence and concluded that no intent to make a gift of non-marital property to the marriage was established.

After applying the test set forth in *Burnside v. Burnside, supra,* the Court cannot conclude that the circuit court or family law master were clearly wrong or that they otherwise erred in reaching the conclusion that the shares in fact had been gifts to Robert E. Mayhew or in refusing to declare the twenty-four gift shares marital property because of the registration of such shares on the same certificate which evidenced the ten shares of marital property. We, therefore, affirm the ruling below that the twenty-four shares are the separate property of Robert E. Mayhew.

## APPRECIATION AND ITS VALUATION

In reviewing the overall question of the gift shares, the Court does believe that the circuit court and the family law master failed to take all actions required by West Virginia's marital distribution law in dealing with the twenty-four separate property shares. Specifically, the Court notes that W.Va.Code § 48–2–1(e) provides that:

"Marital property" means:

\* \* \* \* \* \*

(2) The amount of any increase in value in the separate property of either of the parties to a marriage, which increase results from (A) an expenditure of funds which are marital property, including an expenditure of such funds which reduces indebtedness against separate property, extinguishes liens, or otherwise increases the net value of separate property, or (B) work performed by either or both of the parties during the marriage.

Correspondingly, W.Va.Code § 48–2–1(f) provides:

"Separate property" means:

\* \* \* \* \* \*

(6) Any increase in the value of separate property . . . which is due to inflation or to a change in market value resulting from conditions outside the control of the parties.

■ The record indicates that the twenty-four shares of stock which were given to Robert E. Mayhew, and which the circuit court properly concluded were his separate property, appreciated in value during marriage. West Virginia Code § 48–2–1(e), cited above, requires that such appreciation in value as occurred by reason of the investment of martial assets or the work of the parties is marital property, even though the shares themselves remain separate property. On the other hand, W.Va.Code § 42–2–1(f) provides that the portion of appreciation due to inflation or to a change in market value resulting from conditions outside the control of the parties is separate property. This Court believes that to give full effect to the legislative intent regarding marital distribution, a trial court must address the question of what portion of any appreciation in value in separate property occurring during the marriage is marital property and of what portion remains separate property. That portion which is marital property is, like other marital property, subject to marital distribution.

■ In the case before us, the appreciation in value of separate property during the marriage subject to allocation under the provisions of law just reviewed is appreciation in the value of a corporate business, one which may be generally classified as both small and closely-held. It is fundamental to the concept of equitable distribution that, with respect to a business owned or partially owned by either or both of the parties to a divorce action, the spouses are entitled to share equally in the appreciation in the value of that business during the marriage arising from the investment of marital property or the work of either party in the business, absent one or more of the factors enumerat-

ed in W.Va.Code § 48-2-32(c).[1] That entitlement arises because, under equitable distribution, the contributions of time and effort to the married life of the couple—at home and in the workplace—are valued equally, regardless of whether the parties' respective earnings have been equal. Equitable distribution contemplates that parties make their respective contributions to the married life of the parties in that expectation.

In the case before us, Robert E. Mayhew worked in the family business throughout the married life of the parties. Since 1985, he has owned some part of that business, later acquired greater interests by gift and by purchase, and in late 1991 acquired all the outstanding shares. Since then the business has apparently invested a part of its earnings and assets to pay Mr. Mayhew's father for his former interest in the business. Against that background, the principles of equitable distribution and the statutory direction that the appreciation in the value of Mr. Mayhew's separate property holdings in the business should be allocated between marital property and separate property are clearly applicable. Such principles appear to be particularly appropriate here, where there is evidence that Nancy H. Mayhew, the wife, by her efforts at home, enabled the husband to be absent from the home frequently, attending civic and other meetings and events that were considered likely to foster the success of the business whose stock is at issue here.

Accordingly, this Court believes that the family law master and the trial court should properly have conducted an inquiry into, and the parties were obligated to adduce evidence as to, the allocation of the appreciation in value of the twenty-four shares of separate property stock of Robert E. Mayhew to determine what portion, if any, of such appreciation is marital property and what portion remains separate property. Because the family law master and the trial court did not conduct such an inquiry, we conclude that the judgment of the circuit court must be reversed, and this case must be remanded for the appropriate inquiry and action.

■ We recognize that such an inquiry will not be an easy task. In *Miller v. Miller, supra,* this Court addressed a part of the problem we are now confronting. In that case, as noted above, the parties to the marriage had clearly invested marital assets in the construction and improvement of the various structures on a farm which was the separate property of the husband. In the trial of the matter, evidence had been ad-

---

**1.** West Virginia Code § 48-2-32(c) states:

(c) In the absence of a valid agreement, the court shall presume that all marital property is to be divided equally between the parties, but may alter this distribution, without regard to any attribution of fault to either party which may be alleged or proved in the course of the action, after a consideration of the following:

(1) The extent to which each party has contributed to the acquisition, preservation and maintenance, or increase in value of marital property by monetary contributions, including, but not limited to:

(A) Employment income and other earnings; and

(B) Funds which are separate property.

(2) The extent to which each party has contributed to the acquisition, preservation and maintenance, or increase in value of marital property by nonmonetary contributions, including, but not limited to:

(A) Homemaker services;

(B) Child care services;

(C) Labor performed without compensation, or for less than adequate compensation, in a family business or other business entity in which one or both of the parties has an interest;

(D) Labor performed in the actual maintenance or improvement of tangible marital property; and

(E) Labor performed in the management or investment of assets which are marital property.

(3) The extent to which each party expended his or her efforts during the marriage in a manner which limited or decreased such party's income-earning ability or increased the income-earning ability of the other party, including, but not limited to:

(A) Direct or indirect contributions by either party to the education or training of the other party which has increased the income-earning ability of such other party; and

(B) Foregoing by either party of employment or other income-earning activity through an understanding of the parties or at the insistence of the other party.

(4) The extent to which each party, during the marriage, may have conducted himself or herself so as to dissipate or depreciate the value of the marital property of the parties: Provided, That except for a consideration of the economic consequences of conduct as provided for in this subdivision, fault or marital misconduct shall not be considered by the court in determining the proper distribution of marital property.

duced as to the value of various improvements to the real estate. However, the wife was unable to introduce competent evidence of the value of improvements to the house located on the farm, the former marital domicile. The evidence was adduced by the wife through an appraiser. The appraiser was unable to segregate the value added to the house by improvements made to it from marital assets, but did give separate values for the house, for the farm, and for improvements paid for from marital assets and made to the remainder of the farm, other than the house. The family law master awarded the wife one half of the value of the improvements the appraiser was able to identify but made no award for improvements to the house. The circuit court refused to disturb that ruling. So did this Court, pointing out that in litigating marital distribution issues, both parties have the burden of presenting competent evidence concerning the value of marital property and concluding:

> Based upon the fact that the appellant [wife] was unable to meet her burden of presenting competent evidence regarding the value of the improvements made to the house during the parties' marriage, we find that the circuit court was correct in denying the appellant one-half of the same.

*Miller v. Miller*, 189 W.Va. at 130, 428 S.E.2d at 551.

Indeed, we could leave the parties where we found them, as this Court did in *Miller*, since neither party here, it appears, addressed the issue as we have drawn it, of allocating the appreciation in value of the separate property. However, since this Court has also not considered the issue as drawn here, especially in terms of the allocation of appreciation in the value of small, closely-held corporations, we think it appropriate that the matter be remanded to give both parties a fair opportunity to seek an allocation of the increase in value which occurred after the dates of the various gifts of stock.

We have examined authorities on the subject of equitable distribution and looked for guidance in the decisions of other courts without success. Therefore, we offer only the following general comments to suggest at least the outlines of the inquiry to be conducted:

(1) The appreciation at stake here is not insignificant. The value of the business, as affirmed herein, has been fixed at $648,-586.00. If one assumes that, at the times given, all twenty-four gift shares had the $2,200.00 per share value recorded for the first such gift, the appreciation may be calculated at a sum in excess of $400,000.00. We make these assumptions and calculations to indicate the order of magnitude of the issue being remanded, not to find the values or in any way inhibit the inquiry below.

(2) It may be helpful to ascertain the book value of the shares as of the date previously used by the court below to determine the overall value of the business and, perhaps, to compute book value on other dates. We note that qualified appraisers or accountants may adduce sound reasons to adjust book value for a variety of reasons, such as reversing accelerated depreciation or adjusting for other tax considerations, in order to better reflect the actual net cost of assets and proper amount of liabilities or net book equity. Any such book value exercises, with or without adjustments that may appear justified under the evidence, may aid the court in determining what the actual earnings of the whole business have been for any given period the court deems helpful, what earnings have been retained in the business or otherwise invested, and how such decisions may have contributed to the previously found present value of the business.

(3) It may be possible to identify which assets in the business, if any, appreciated in value above their net book or carrying value and perhaps how any such appreciation was treated by the experts previously testifying for each party in the formulation of their previously expressed opinions as to the value of the business. The court may hear still other opinions as to book value of assets, appreciation, and current value, as the court may be advised. The court below may thus obtain at least a preliminary indication of appreciation by reason of inflation or other outside factors.

(4) Perhaps evidence can be developed regarding the performance of this business relative to others of similar size, character and circumstances which will aid the court. In this connection, comparisons of typical or average sales, gross margins and expenses, including the usual level of salaries and benefits of executives of other businesses, and the degree to which inflation, the particular success of the product line of the business, or some other factor directly influenced by or beyond the control of the manager of this business may be helpful in making the required allocation.

(5) We note that segregating the increase in value attributable to the work and effort of a stockholder may or may not bear any relationship to the value of his or her shares or the percentage of ownership. An owner may expend virtually all or very little time and effort in the business. Or the business may reap substantial benefits from the labors of others, some of whom may have been selected, trained, or directed by the owner and some of whom may not have been so selected, trained, or directed. The business may prosper or suffer from a unique or distinctive product line, or from purely fortuitous circumstances. Moreover, one case may be more difficult to assess than another, because the owner of the stock being valued holds only a fractional interest in the business and has more, or less, opportunity to contribute to the overall success of the business than is indicated by ownership percentages. In such situations, the increase in value attributable to the work and effort of the share owner may indeed be quite difficult to assess.

(6) None of the factors we have set out here are intended to control or limit the inquiry below. As the Court indicated in *Miller*, the burden is on both parties to the litigation to adduce competent evidence on the values to be assigned in equitable distribution cases. We recognize that this matter of segregating the increase in value attributable respectively to marital and separate property is novel for this Court and the tribunal below. We leave the court below free to rule on issues such as the competency of experts, the relevancy of expert testimony, and like issues. We think it unlikely that the parties or the tribunal below will achieve precision; as in appraisal matters generally, substantial justice, fairly supported by the evidence, is perhaps the best we can expect.

(7) We perceive that the burden of going forward with the evidence is on both parties as to their respective claims, as indicated by *Miller*, and that the burden of persuasion is on the party asserting a right to the property, that is to say that the burden of persuasion with respect to characterizing the property as separate property is on the one claiming the property to be separate and the burden of persuasion with respect to characterizing the property as marital is on the party claiming the benefit of that result. We are cognizant of the prior holding of this Court that our law shows a preference for characterizing property as marital property. Syllabus point 3, *Whiting v. Whiting, supra.* However, we do not see that holding as very helpful in this novel area. Indeed, the court below has already characterized the property at issue as separate. We cannot now see a benefit to creating any new presumption, especially a presumption that might be rebutted by adducing only slightly contrary evidence. We leave to another day, or perhaps to legislative initiative, the development of any more specific formulations. At this point, it appears best to rely on the sound and reasoned discretion of the trier of fact.

After making the inquiry here required, the family law master, or the court, if it so elects,[2] should make specific findings on the value of the gift shares when transferred to the husband and on the allocation of the increase in their value thereafter to marital and separate property as the evidence, as weighed and considered by the trier of fact, shall justify, and enter such further order as shall be necessary to effectuate equitable distribution of the marital property thus determined.

**2.** West Virginia Code § 48–2–25 allows the court either to refer the case to a family law master or to hear it itself.

### OTHER ASSIGNMENTS

Nancy H. Mayhew next challenges the fact that the circuit court awarded her only rehabilitative alimony, did not provide her with permanent alimony, and did not provide that the rehabilitative alimony should extend beyond the death of Robert E. Mayhew, in the event that he should die before the period of rehabilitative alimony expires.

A review of the evidence in this case shows that Nancy H. Mayhew had a college education, was in good health, and was fully capable of entering the job market. There was also evidence that she either elected to train for a career as a court reporter or in some other way pursue a career as a court reporter. In this Court's view, these facts fail to suggest that the circuit court or family law master were clearly wrong in denying Nancy H. Mayhew a permanent alimony award. The record also suggests that Nancy H. Mayhew received a considerable distribution of assets as a result of the orders in this case and may well receive a greater award after the inquiry regarding the increase in value of the gift stock in the business herein ordered. The judgment below is affirmed with respect to the denial of permanent alimony, but the entire issue of alimony must be revisited after the court has concluded the inquiry regarding the allocation of appreciation in value of the shares of stock.

■ Nancy E. Mayhew further complains that the period of rehabilitative alimony was too short and that payment of that rehabilitative alimony should continue for whatever period it is awarded, whether or not Robert E. Mayhew should sooner die. Essentially, the Court believes that the period of rehabilitative alimony was within the discretion of the trial court and that the court did not err in the length of time for which it was ordered.

With respect to extending the rehabilitative alimony beyond the death of Robert E. Mayhew, the court below said only:

Inasmuch as the Court agrees with the Master's finding that permanent alimony will not be awarded, the question of such extending beyond the death of Defendant is moot.

■ It does not appear that the ruling of the court below adequately disposed of the issue under discussion. It is within the power of the trial court to require that alimony be paid notwithstanding the death of the payor, and this Court has held that if the court does not specify that alimony will stop upon the death of the payor, a claim may be had against the estate of a deceased payor for continued payment of alimony, which claim will be sustained in certain circumstances. *In re Estate of Hereford,* 162 W.Va. 477, 250 S.E.2d 45 (1978). We note that the Legislature has required that, in the case of a separation agreement to be approved by the court, if the separation agreement does not resolve the question of alimony after the death of the payor, the court must do so incident to examining and approving the agreement.[3] It appears that the discretion of the trial court, in cases not involving a separation agreement, to award or not award alimony past the death of the payor has been left undisturbed by W.Va.Code § 48–2–15 and that the best practice for the trial court in all circumstances is to address and decide the issue of whether alimony is to cease upon the death of the payor.

■ In the case of rehabilitative alimony, we perceive that the policy consideration underlying the award of rehabilitative alimony—to enhance the earning capacity and self-sufficiency of the payee—favors the continuation of alimony notwithstanding the death of the payor. Although alimony will usually be awarded from the income of the payor, the award of alimony is not foreclosed by the absence or inadequacy of income. It may be awarded from the payor's assets. W.Va.Code § 48–2–15. Thus, it appears that sound policy favors the continuation of short-

---

**3.** The portion of W.Va.Code § 48–2–15(f) covering this specifically states:

When alimony is to be paid pursuant to the terms of a separation agreement which does not state whether the payment of alimony is to continue beyond the death of the payor party or is to cease, or when the parties have not entered into a separation agreement and alimony is to be awarded, the court shall specifically state as a part of its order whether such payments of alimony are to be continued beyond the death of the payor party or cease.

term alimony past the untimely death of the payor in the absence of evidence that the payor's estate, should the payor die, is likely to be insufficient to meet other obligations, or other matters appear which would make such continuation after death inequitable.

■ Similarly, we perceive that the right of the payee to receive rehabilitative alimony ceases with payee's death. Absent some compelling circumstance for otherwise providing in the order awarding such alimony, the right to receive rehabilitative alimony should and would end at the death of the payee, since the issue of enhancing the earning capacity and self-sufficiency of the payee would be moot in the event of payee's untimely death. In the rare case where a court wishes to provide otherwise, it would be essential that the order expressly provide for the enforcement of that right in payee's personal representative.

As noted, in the present case the trial court offered no adequate reason why the award of rehabilitative alimony, apparently aimed at assisting Nancy H. Mayhew in re-entering the job market, should not be for the full period awarded, regardless of the untimely death of Robert E. Mayhew. As noted, this case must be remanded for a reconsideration of the value of the twenty-four gift shares of stock involved in the case. It will be necessary to review the entire issue of alimony after the allocation of value issues are resolved. The continuation of any alimony awarded beyond the death of the payor should be addressed within the discretion of the court, and the decision and its basis clearly articulated.

Next, Nancy H. Mayhew claims that the circuit court erred in failing to award her full legal and accounting fees.

The circuit court found that Nancy H. Mayhew "went out of her way to attempt to gig" Robert E. Mayhew with the costs of many items for herself during the pendency of the divorce and that the court's inclination would be to rule that each party was to pay his or her own attorney fees and accounting fees. The court, however, noted that the family law master had concluded that Robert E. Mayhew should be required to pay Nancy H. Mayhew $6,500.00 in attorney fees and accounting fees. The court, after examining the record, concluded that the family law master's finding, which was different from the court's own, could not be said to be clearly wrong and, therefore, affirmed and adopted that finding.

■ West Virginia Code § 48–2–13(a)(6)(A) provides that "[t]he court [in a divorce proceeding] may compel either party to pay attorney's fees and court costs reasonably necessary to enable the other party to prosecute or defend the action in the trial court." Also, under W.Va.Code § 48–2–13(a)(6)(B), the assertion of unfounded claims or defenses for "vexatious, wanton or oppressive purposes" by a party is made a fact relevant to a party's responsibility for attorney fees and costs.

It appears that the appellant has been able to prosecute the proceedings thus far in this case. The family law master found the $6,500.00 attorney and accounting fee award to be appropriate. The court noted that the appellant had itemized items for attorney fees and charges that were unnecessary and attempted "to gig the defendant" with costs. In spite of this, the court acceded to the recommendation of the family law master.

As suggested in syllabus point 4 of *Ball v. Wills, supra*, the question before this Court is whether the lower court's ruling constituted an abuse of discretion. Since the appellant was able to prosecute the action successfully, and since the evidence shows that the appellant has a substantial income, this Court cannot conclude that the trial court's ruling constituted an abuse of discretion.

We note that this opinion requires additional proceedings, and, in conjunction with those proceedings, the court below should ascertain that the parties are financially able to carry the burden of the additional proceedings and make such orders as will allow both parties a full and fair hearing, requiring the parties to bear reasonable costs from their own assets, from the assets of the other party, or from assets to be awarded as a result of the further proceedings as the court finds fair and just.

Lastly, Nancy E. Mayhew claims that the trial court erred in failing to order both parties to exchange financial information each year until the parties' youngest child reaches the age of eighteen.

Under the law, Nancy H. Mayhew may appropriately petition the court from time to time for an adjustment of child support. In such a proceeding, Robert E. Mayhew could be legally compelled to reveal financial information relating to his affairs. In view of this circumstance, the Court cannot conclude that the trial court committed reversible error by failing to order the annual exchange of information.

Because this Court believes that the trial court should examine the question of what portion of the gift shares appreciation was attributable to work performed by Robert E. Mayhew during marriage and what portion was due to inflation or other conditions outside the control of the parties and that that inquiry may require an adjustment in the alimony and other factors in the overall settlement of this case, the judgment of the circuit court is reversed, and this case is remanded for action consistent with the principles set forth herein.

Reversed and remanded with directions.

WORKMAN, J., dissents and reserves the right to file a dissenting opinion.

RECHT, J., concurs in part and dissents in part.

WORKMAN, Justice, dissenting:

(Filed July 19, 1996)

I dissent from the majority because of its failure to thoroughly or properly analyze the facts and the applicable law in upholding the lower court's award of twenty-four shares of stock to the Appellee as his separate property and in its unjust and confusing decision regarding alimony.

## I. SEPARATE V. MARITAL PROPERTY

In determining that the stock in the dealership was separate property, the majority neglects to give any real analysis to the Appellant's contention that the stock given to the Appellee during the course of the marriage by his father was done so in lieu of compensation for marital efforts on behalf of the business. The majority also fails to give any real analysis to the Appellant's argument that the Appellee transmuted his separate property to marital property. Finally, the majority further fails to give any real consideration to the issue of the extent to which the marital efforts of the wife helped create the appreciation of the corporate assets.

### A. COMPENSATION THEORY

The record presents a strong case that because the Appellee spent the majority of his time at the dealership, his father compensated him with corporate stock in lieu of additional salary. This was particularly obvious with regard to the Appellee's receipt of the last sixteen shares of stock which were transferred to the Appellee's name in 1988, 1989, and 1990, after he returned to Mayhew Chevrolet from working for a competitor dealership in Virginia. The evidence introduced by the Appellant demonstrated that the gifts of stock given to the Appellant in these years were part of an overall compensation package designed by the Appellee's father to entice him not to return to the competition. Moreover, evidence that the stock was, in reality, compensation was even more powerful in light of the fact that the Appellee's brother received only a Chevrolet Corvette from his father prior to 1988 to equalize the gift of stock to the Appellant.[1] The testimony established, however, that the Chevrolet Corvette would not begin to equal the value of the shares of stock. This issue was given only cursory attention by the lower court.

Similarly, the majority neglects any real dissertation of the law on this issue by giving only lip-service to the Appellant's argument

---

1. There was also some testimony from the Appellee's father that he gave the Appellee's brother money, but the Appellee's father was extremely vague about how much money was given to his other son.

that the twenty-four shares of stock were given to the Appellee as compensation for his work at the dealership and fails to engage in any legal analysis whatsoever of the law as it applied to the facts below. This is evident when the majority states:

> "Although the evidence relating to Robert E. Mayhew's salary was conflicting and potentially could have supported a finding that the shares were not in fact gift shares, the family law master and the circuit court adopted the finding that evidence did in fact show that they were intended as gift shares ..."

Clearly absent from the above-mentioned determination is *any* consideration of the law in this area. Furthermore, the majority ignores the following fundamental principles of the law of equitable distribution that we reaffirmed in *Whiting v. Whiting*, 183 W.Va. 451, 396 S.E.2d 413 (1990):

> We have recognized the concept of marriage as a partnership or shared enterprise. In *Dyer v. Tsapis*, 162 W.Va. 289, 291–92, 249 S.E.2d 509, 511 (1978), we stated: "The law which once saw marriage as a sacrament now conceptualizes it as roughly analogous to a business partnership." (Footnote omitted). In *LaRue v. LaRue*, 172 W.Va. 158, 304 S.E.2d 312 (1983), we confirmed this characterization of marriage by concluding that contributions of traditional domestic services were as worthy of consideration in the distribution of the marital estate as monetary contributions. The equitable distribution provisions adopted by the legislature in 1984 following our decision in *LaRue* incorporated this partnership concept of marriage into our statutory divorce law.

183 W.Va. at 458, 396 S.E.2d at 420; *see* John DeWitt Gregory, *The law of Equitable Distribution* ¶ 1.06 (1989).

Consequently, "[a]s a general rule, W. Va. Code, 48–2–1(e)(1) (1992), provides that property acquired by either spouse after the marriage but prior to separation of the parties or dissolution of the marriage is presumed marital property regardless of how title is actually held." *Burnside v. Burnside*, 194 W.Va. 263, 266, 460 S.E.2d 264, 267 (1995). Moreover, we have concluded that "the Legislature 'express[ed] a marked preference for characterizing the property of the parties as marital property[,]' " as indicated in its definitions of marital and separate property found in West Virginia Code § 48–2–1 (1992). 194 W.Va. at 267, 460 S.E.2d at 268 (quoting *Whiting*, 183 W.Va. at 459, 396 S.E.2d at 421). Thus, where as here there are serious and consequential arguments to support the contention that property is marital, such contentions should at least receive some serious attention and analysis.

Keeping in mind these principles and presumptions of equitable distribution, the Supreme Court of Virginia's decision in *Lambert v. Lambert*, 6 Va.App. 94, 367 S.E.2d 184 (1988), a case analogous to the instant one, is helpful in analyzing whether equity in a company is marital or separate property under a compensation theory. In *Lambert*, three years after the parties were married, the husband, a pharmacist, and his father, organized a partnership to operate a business known as Lambert Pharmacy. Over the years the partnership flourished, and ultimately, the father gave to the husband the father's entire interest in the partnership. *Id.* 367 S.E.2d at 186. Upon the break-up of the marriage, the husband claimed that the partnership was his separate property. Even though the partnership's balance sheets showed that the husband made an initial capital investment of $373.45,[2] which the husband failed to remember making, the lower court concluded that the husband's interest in the partnership was a gift from his father and, therefore, the husband's separate property. *Id.* at 187.

The Virginia Supreme Court, however, viewed the situation differently in reversing the lower court's decision. The court noted that

> [t]he evidence suggests that in addition to monetary consideration, the husband also may have provided further consideration for the partnership interest in the

---

**2.** The husband's father's initial capital investment was $19,296.60. *Lambert*, 367 S.E.2d at 187.

form of his services to the partnership.... [T]he record reflects that the husband devoted his full time and attention to the business. Thus, the ongoing success and growth of the business were entirely the product of the active efforts of the husband, who also served the business as a licensed pharmacist. Although the husband received a salary from Lambert Pharmacy, the record does not establish the amount of that salary in relation to his duties as pharmacist and sole manager of the enterprise and does not negate the inference that the profits, ... were earned by the husband as additional consideration for his in kind services to the partnership.

*Id.* at 188. Accordingly, the *Lambert* court concluded that "[t]o the extent the husband's partnership interest was received in exchange for consideration which he provided, whether monetary or otherwise, it cannot be defined as a gift, and does not qualify for treatment as separate property...." *Id.* (citation omitted).

Similarly, in the instant case, to the extent that the shares of stock were acquired in exchange for all the time and work expended by the Appellee (marital efforts) on behalf of the dealership, the stock shares should have been treated as marital property. Such a determination would have upheld this Court's preference for treating property received during the course of a marriage as marital property. Most importantly, the lower court and this court should have at least engaged in some legal analysis, rather than the mindless knee-jerk reaction that "that is his, and it stays his."

### B. TRANSMUTATION THEORY

The Appellant also contended that the Appellee transmuted[3] his separate property, the twenty-four shares of stock, into marital property when he combined all of his separate stock with marital stock and reissued it in one stock certificate. While the majority rejects the Appellant's argument that a

transmutation occurred, it does so by focusing almost exclusively on whether the Appellee intended to make a gift of the stock shares to the marriage, without any consideration of other factors.

Completely absent from the majority opinion is any discussion of *Burnside,* our most recent decision in this area. In *Burnside,* the wife appealed the lower court's determination that contribution she had made with separate funds to pay off the mortgage on the marital home transmuted those separate funds into marital property. We held that there was a marital gift presumption that "is rebuttable only by clear, cogent, and convincing evidence that a gift was not intended or that the transaction under scrutiny was the result of coercion, duress, or deception." 194 W.Va. at 269, 460 S.E.2d at 270. As the Illinois Appellate Court noted in *In re Marriage of Brown,* 110 Ill.App.3d 782, 66 Ill. Dec. 488, 443 N.E.2d 11 (1982),

> [p]resuming transmutation of non-marital property gives further recognition to the equal partnership theory of the Act and to the contribution of the homemaker. Further, the court found that transmutation promotes the statutory preference for classifying property as marital which, even when the contribution of the spouse is insignificant, allows for more equitable distribution of property because the pool of marital property is greater.

*Id.* 66 Ill.Dec. at 490–91, 443 N.E.2d at 13–14; *accord Lambert,* 367 S.E.2d at 190.

We further engaged in a lengthy discussion of what type of evidence could rebut the marital gift presumption. We stated that "evidence that a gift is made for the purposes of avoiding taxes or other adverse consequences associated with estate planning does not refute the fact that a gift was made in the first instance." *Id.* at 270, 460 S.E.2d at 271. Moreover, titling of the gift is also insufficient to overcome the presumption. *Id.* We ultimately concluded that

---

**3.** We most recently defined the transmutation doctrine in *Burnside,* we stated that "[t]ransmutation is the conversion of separate property into marital property during the marriage by express or implied acts. Courts have held that transmutation can occur by title, by express or implied agreement, by commingling of funds, or by interspousal gift." 194 W.Va. at 266 n. 3, 460 S.E.2d at 267 n. 3.

the presumption of a gift to the marital estate may not be rebutted by evidence that merely reflects the motivation for making the gift or an uncommunicated and subjective state of mind of the transferring spouse or that, when viewed alone, can be considered inconsistent with the intent to maintain the property as separate. Rather, more substantial evidence is required that clearly is indicative of a lack of donative intent.... [While] there are no bright-line rules in determining what type of evidence is sufficient to rebut the presumption[,] [i]t appears that circumstances existing at the time of the transfer indicative of the owner's intention are considered crucial by the courts in determining whether a gift was made to the marital estate.

*Id.* at 271–72, 460 S.E.2d at 272–73 (footnotes omitted).

Thus, while the intent of the donor may be important, we certainly did not limit our analysis of these issues solely to intent. Other courts have indicated that "[t]he doctrine of transmutation is premised upon the principle that *no one factor, such as the source of the funds* [4] used to acquire property or the name in which property is titled, is determinative of the issue of whether, for purposes of division of property ... the property is separate or marital." *Dunlap v. Dunlap,* Nos. C–94–0033, C–940050, slip op. at 5, 1996 WL 134543 (Ohio Ct.App. March 27, 1996). Other factors that the Ohio Court of Appeals found necessary to consider were outlined in syllabus point two of *Kuehn v. Kuehn,* 55 Ohio App.3d 245, 564 N.E.2d 97 (1988):

When considering an alleged transmutation the trial court, within its sound discretion, should consider (1) the expressed intent of the parties insofar as it can be reliably ascertained; (2) the source of funds, if any, used to acquire the property; (3) the circumstances surrounding the acquisition of the property; (4) the dates of the marriage, the acquisition of the property, the claimed transmutation, and the breakup of the marriage; (5) the inducement for and/or proposed of the transac-

tion which gave rise to the claimed transmutation; and (6) the value of the property and its significance to the parties.

*Id.* 564 N.E.2d at 98.

Upon examination of the majority decision, it is evident that the majority gave short shrift to its examination of other factors relevant to a determination of whether the Appellee transmuted his separate property into marital property, rather choosing to take the easy way out by focusing solely on the *his* intent. (It really is a man's world, isn't it?) The majority should have recognized that factors other than the husband's intent should be considered on the issue of transmutation.

## C. WIFE'S MARITAL EFFORTS

In order to fully appreciate the extent of the Appellant's marital efforts in aiding the Appellee in his work at the dealership, it is helpful to examine these facts: During the parties' marriage, the Appellee worked at the car dealership every day from early in the morning until 7:00 p.m. or 8:00 p.m. at night. In addition, he worked every Saturday until at least 3:00 p.m. or 4:00 p.m. The Appellant would often prepare the Appellee's dinner and take it, together with their two daughters, to the dealership so they would have an opportunity to visit with their father for a short period of time during the weekdays, and so that he (as well as other employees on some occasions) could have dinner without interrupting their work. The Appellee also was very active in community organizations as an aid to his business and the Appellant assisted in that respect as well. The Appellant helped her husband directly in many ways in the business, including actually working there without compensation before the children were born. On weekends, the family participated in social or civic activities for the purpose of becoming more visible in the community to increase the sale of new and used cars from the dealership. The wife did virtually all the household/child care duties, including mowing six-plus acres and tending to sheep, cattle, chickens and other

---

**4.** In *Whiting,* we stated in syllabus point six that "[t]he source of funds doctrine is ordinarily not available to characterize as separate property that property which has been transferred to joint title during the marriage." 183 W.Va. at 453, 396 S.E.2d at 415.

farm animals. It is impossible not to conclude that the wife's efforts doing virtually all of the domestic work in this marriage, as well as the other efforts she made not only to work directly for the business but also to free her husband up to work in the business, helped this business appreciate.

West Virginia Code § 48–2–1(e) includes in the definition of marital property: "(2) The amount of any increase in value in the separate property of either of the parties to a marriage, which increase results from ... work performed by *either* or both of the parties during the marriage." *Id.* The majority adds an extra phrase that does not appear in the statute in characterizing this factor as work performed "in the business." The statute expresses no such limitation. Rather the statutory intent is that any work performed by either party that causes an increase in value of separate property is marital property. Since marriage is a partnership, the efforts of a stay-at-home spouse to free the working spouse of domestic obligations in order that his business can grow and prosper should have value and should have been considered.

A fair and realistic view of these people's lives and work must reflect some legitimate expectation by the wife that she was also building something, because it was her efforts on the home front (as well as for the business) that afforded her husband the opportunity to devote the significant amount of time he did to the dealership. Surely the majority does not believe that a woman who does the bulk of the homemaking and child-rearing duties, giving her husband almost total freedom to build his business should not be entitled to some investment for her life as well. This is especially so where as here he decided she had outlived her usefulness, which brings us to the second major issue—alimony

## II. ALIMONY

We have consistently held that the first primary consideration in determining alimony is the economic situations of the parties and the need of the obligee. As we stated in *F.C. v. I.V.C.*, 171 W.Va. 458, 300 S.E.2d 99 (1982), "[c]oncrete financial realities of the parties must be a court's primary inquiry in any alimony award." *Id.* at 460, 300 S.E.2d at 101; *see Hickman v. Earnest*, 191 W.Va. 725, 726, 448 S.E.2d 156, 157 (1994). The statute sets forth a number of other factors.[5]

---

5. West Virginia Code § 48–2–16(b) (1995) provides, in pertinent part:

The court shall consider the following factors in determining the amount of alimony ... if any, to be ordered ...:

(1) The length of time the parties were married;

(2) The period of time during the marriage when the parties actually lived together as husband and wife;

(3) The present employment income and other recurring earnings of each party from any source;

(4) The income-earning abilities of each of the parties, based upon such factors as educational background, training, employment skills, work experience, length of absence from the job market and custodial responsibilities for children;

(5) The distribution of marital property to be made under the terms of a separation agreement or by the court under the provision of ... [§ 48–2–32] of this article, insofar as the distribution affects or will affect the earnings of the parties and their ability to pay or their need to receive alimony, child support or separate maintenance;

(6) The ages and the physical, mental and emotional condition of each party;

(7) The educational qualifications of each party;

(8) The likelihood that the party seeking alimony, child support or separate maintenance can substantially increase his or her income-earning abilities within a reasonable time by acquiring additional education or training;

(9) The anticipated expense of obtaining the education and training described in subdivision (8) above;

(10) The costs of educating minor children;

(11) The costs of providing health care for each of the parties and their minor children;

(12) The tax consequences to each party;

(13) The extent to which it would be inappropriate for a party, because said party will be the custodian of a minor child or children, to seek employment outside the home;

(14) The financial need of each party;

(15) The legal obligations of each party to support himself or herself and to support any other person; and

(16) Such other factors as the court deems necessary or appropriate to consider in order to arrive at a fair and equitable grant of alimony....

We also have recognized that fault should be considered in the award of alimony. *See* Syl. Pt. 1, *Charlton v. Charlton*, 186 W.Va. 670, 413 S.E.2d 911 (1991). Then in syllabus point one of *Rexroad v. Rexroad*, 186 W.Va. 696, 414 S.E.2d 457 (1992), we discussed the exact role that fault has in alimony determinations:

> W.Va.Code, 48–2–15(I) (1991), bars a person from alimony in only three instances: (1) where the party has committed adultery; (2) where, subsequent to the marriage, the party has been convicted of a felony, which conviction is final; and (3) where the party has actually abandoned or deserted the other spouse for six months. In those other situations where fault is considered in awarding alimony under W. Va.Code, 48–2–15(I), the court or family law master shall consider and compare fault or misconduct of either or both of the parties and the effect of such fault or misconduct as a contributing factor to the deterioration of the marital relationship.

Finally, we have recently reemphasized the role of the factor of fault plays in determining alimony. In syllabus point four of *Rogers v. Rogers*, 197 W.Va. 365, 475 S.E.2d 457 (1996) we stated that:

> In appropriate circumstances, an enhancement of an award of maintenance/alimony based on the degree of fault is justified. Enhancement of a maintenance/alimony award by a fault premium may be awarded when additional support is required to reimburse the injured spouse for expenses directly related to the fault or to assure that the injured spouse continues to have the standard of living enjoyed during the marriage. A fault premium may also be applied to discourage the fault or behavior that contributed to the dissolution of the marriage. In determining an award of maintenance/alimony enhanced by a fault premium, the circuit court must consider the concrete financial realities of the parties.

Here the record reflects that the husband sought a divorce because of a relationship with another woman and because he no longer wanted the strictures on his freedom imposed by marriage.

The question of rehabilitative versus permanent alimony has been discussed on prior occasions, and a number of factors have been identified in determining when permanent as opposed to rehabilitative alimony is justified. In syllabus point three of *Molnar v. Molnar*, 173 W.Va. 200, 314 S.E.2d 73 (1984) we stated:

> There are three broad inquiries that need to be consider in regard to rehabilitative alimony: (1) whether in view of the length of the marriage and the age, health, and skills of the dependent spouse, it should be granted; (2) if it is feasible, then the amount and duration of rehabilitative alimony must be determined; and (3) consideration should be given to continuing jurisdiction to reconsider the amount and duration of rehabilitative alimony.

We placed the following caveats on the imposition of rehabilitative alimony in syllabus points six and seven of *Wyant v. Wyant*, 184 W.Va. 434, 400 S.E.2d 869 (1990):

> In cases in which the supporting spouse has an income and earning capacity substantially greater than that which the dependent spouse could realistically achieve under even the best of circumstances, rehabilitative alimony may not be sufficient if the defendant spouse is the primary caretaker of minor children and did not intend to join the work force on a full time basis prior to the dissolution of the marriage.
>
> A court should not relieve a spouse from the duty to maintain the dependent spouse and children by providing only rehabilitative alimony simply because the dependent spouse may have the skills necessary to facilitate a *return to the job market*. Instead, the court should consider the following factors before opting for rehabilitative alimony over permanent alimony: (1) the dependent spouse's position in the home at the time of the divorce; (2) the age of the children; (3) the parties' income at the time of the divorce and their potential income in the future; and (4) the benefit, where economics permit, of the dependent spouse remaining in the home to care for the children.

The husband owns all of the stock in Mayhew Chevrolet, which the family law master found to be worth $648,586.00. Appellee earns a salary of $53,000.00 per year, and the corporate tax returns indicate he could have been paid much more.

The Appellant has no income, and although she is in court reporter training, she has no guarantee of a job, especially in a rural area such as Hampshire County.

When the Appellee decided he wanted to end the marriage, it seems patently unfair that his wife of fifteen years should be required to start from scratch, as she approached middle age and have no support at all while her ex-husband flourishes financially.

Lastly, the majority in addition to botching the legal analysis surrounding the Appellant's contention regarding permanent alimony, also botches its apparent remand of the alimony determination to the trial court. A remand generally indicates that this Court is not resolving the issue. The majority, however, states that while it is remanding "the entire issue of alimony," "[t]he judgment below is affirmed with respect to the denial of permanent alimony[.]" Simply stated, it has to be one or the other. Unfortunately, the language concerning the remand issue of the alimony award is so confusing that the lower court may have a difficult time figuring out what it is directed to do.

On remand the lower court should heed the portion of the majority's opinion that indicated that the entire issue of alimony should be examined, for despite the murky, confusing language, that in my opinion was the intent of the majority, although such is not clearly reflected in the written opinion.

### III. ATTORNEY FEES/EXPERT WITNESS FEES

Similarly, I dissent from the majority's failure to reverse on the lower court's refusal to order the Appellant's attorney fees and expert witness fees be paid by Appellee.

In *Banker v. Banker*, 196 W.Va. 535, 474 S.E.2d 465 (1996), we recently held that attorney fees and expert witness fees should be paid by the party whose fault in the dissolution of the marriage caused the other party to have to incur such fees.

### IV. SUPPORT AS A DEDUCTION AGAINST EQUITABLE DISTRIBUTION

As the majority acknowledges in the introduction to its opinion it (but never addresses in any fashion), the Appellant also contends that the lower court erred in deducting certain expenditures made by the Appellee for mortgage and automobile payments from her equitable distribution share. Pursuant to an October 13, 1994, temporary order, the Appellee was required to make monthly payments of $402.01 for the mortgage and $142.17 for the car payment. He did so. The lower court then reduced the Appellant's share in equitable distribution by those amounts, essentially crediting him for payments he was required to make in the form of support anyway.

We recently encountered a similar misapprehension of whether support can be used as a credit against equitable distribution in *Smith v. Smith*, 197 W.Va. 505, 475 S.E.2d 881 (1996). In that case, the family law master initially ordered the husband to make the remaining payments on a family van. Upon the husband's payment of the remaining amount owed, the family law master valued the van at a higher price for purposes of equitable distribution, thereby returning to the husband as equitable distribution a significant portion of the amount he had been ordered to pay as support. We found error in that resolution and remanded for proper valuation of the van for purposes of equitable distribution. *Smith*, 197 W.Va. at 513, 475 S.E.2d at 889.

The result in the present case effectively divested the Appellant of a portion of the money which was to be paid by the Appellee for car and mortgage payments. Why the majority would permit such absurdity is unfathomable. Absent an indication in the order that payments were to be considered as installments for the distribution of marital property, payments are deemed alimony, pursuant to the pertinent portion of West

Virginia Code § 48–2–15(b)(4) (1991), emphasis added:

> The court may require payments to third parties in the form of home loan installments, land contract payments, rent, payments for utility services, property taxes, insurance coverage, or other expenses or charges reasonably necessary for the use and occupancy of the marital domicile. Payments made to a third party pursuant to this subdivision *for the benefit of the other party shall be deemed to be alimony, child support or installment payments for the distribution of marital property,* ... **Provided, That if the court does not set forth in the order that a portion of such payments is to be deemed child support or installment payments for the distribution of marital property, then all such payments ... shall be deemed to be alimony.**

*See Sly v. Sly,* 187 W.Va. 172, 416 S.E.2d 486 (1992).

For the foregoing reasons, I dissent.

RECHT, J., joins in Part II of the dissent.